JOSEPHINE KNAPP LESTER, Appellant, *v.* GEORGE B. LESTER, Respondent.

Second Department, May 18, 1917.

**Husband and wife — divorce — modification of decree as to custody of child — evidence — effect of subsequent marriage of husband in foreign State — effect of subsequent marriage of wife — financial and social situation of parent — education of child — interest of child.**

Upon a reference on a motion for the modification of a decree of divorce as to the custody of an infant, unlimited investigation into the antecedents of the parties and their respective families during the period of their differences which culminated in their separation and final divorce, aside from the guilt of the defendant proven in the divorce action, does not tend to establish that as to moral and intellectual fitness, or in parental affection, either party in comparison with the other is unworthy to have the custody of the child, in whole or in part, but merely tends to prolong the reference.

It is error on such a reference for the referee to exclude evidence establishing defendant's guilt in the divorce action and showing its character as gross and continued, and not casual, temporary and exceptional.

As a general rule, the custody of children of divorced parties, especially of the only child, will be given to the innocent party.

The remarriage in another State of the defendant in a divorce action, contrary to the decree of divorce of the court of this State, does not impair his fitness to have or share in the custody of his only infant child, but where such marriage is to a concededly respectable and worthy woman, with whom he has lived an entirely exemplary life, it may to some extent increase his fitness.

The remarriage of the plaintiff in a divorce action to an entirely worthy and respectable man does not diminish her just claim to the custody of her infant child.

The fact that the defendant in a divorce action was financially able to provide his nine-year-old daughter and only child with better educational advantages and social opportunities than the mother could furnish where she lived, is not a sufficient ground for depriving her of the custody of the child.

Where a divorced father has agreed to pay $500 per month for the maintenance, support and education of his nine-year-old daughter until she becomes fourteen years of age, and the court has ordered that she be allowed to visit with the father at a distant place at frequent intervals, the father's request that his daughter have private instruction should be granted by the court, as attendance at any school, public or private, with such frequent interruptions would be utterly impracticable.

Although the interest of the child is the paramount consideration upon the question of its custody, it is not the exclusive consideration, and the natural right of the parent is an impo tant factor, especially where it has not been forfeited by gross misconduct.

APPEAL by the plaintiff, Josephine Knapp Lester, from an order of the Supreme Court, made at the Rockland Special Term and entered in the office of the clerk of the county of Rockland on the 8th day of November, 1916.

*Arthur E. Sutherland* [*Frank S. Coburn* with him on the brief], for the appellant.

*Gustav Lange, Jr.,* for the respondent.

MILLS, J.:

This is an appeal by plaintiff from an order made at the Rockland Special Term, November 8, 1916, amending the final decree of divorce rendered in this action in favor of the plaintiff and against the defendant, so far as it concerns the custody of their only child, a girl of about nine years of age, so as to give the general custody of the child to the defendant, the father, with merely the right of certain visitation reserved to the mother, which constitutes an exact reversal of the provision made in that decree.

The defendant's motion asked that that decree should be modified as well as to its provisions as to alimony, which had been made by means of an agreement between the parties, approved by the court, upon the ground that the plaintiff had meanwhile married another man and by such marriage had ceased to need pecuniary support from the defendant, her former husband; but the learned court at Special Term denied that part of the motion for want of power. The defendant not having appealed from the order, the latter determination is not before us for direct review.

The following is a statement of the principal facts, which are substantially undisputed.

The parties were married June 27, 1900, at the city of Auburn in this State. Each was the child of a very respectable family of good social position, but apparently of quite moderaet pecuniary means, evidently of about equal station in every respect. Her family was and long had been residents of

Auburn, and his of the village of Seneca Falls, some 16 miles distant, both places being about 350 miles· distant from New York city. He was twenty-eight and she twenty-four years of age, and neither had been married before. Each had had a fairly good education, at least academic although not collegiate, which apparently the means of neither set of parents had warranted. The defendant, after leaving the academy, had taught school in several different places, studied law and finally been admitted as an attorney and counselor of this court in the fall of 1896 in New York city, where he last taught, and from that time had been engaged in that city in the practice of his profession. It is evident that his career, at least up to that point, had been most creditable, and that it gave good promise for a successful future. The couple at once took up their residence in New York city and continued to reside there until their separation hereinafter to be noted. Their only child, the subject of this proceeding, a girl, was born there August 23, 1907. It would seem that their married life for several years was harmonious. Meanwhile defendant's practice had grown until, about the time of the birth of the child, he became the general counsel of the Fleischmann Yeast Company and later one of its chief executive officers, which position he still occupies with a salary at present of $60,000, the business of the company being very extensive. By December, 1910, acute differences had arisen between the parties, resulting as to him in accusations by her against him, charging him with excessive drinking and with infidelity with a certain woman, an adventuress, who he admitted had endeavored to blackmail him and who with her story had reached the ears of his wife and her brother, and with whom the husband had had some association; and in accusations by him against her, charging her with improper conduct with certain men and with indifference to her home duties. Their differences culminated in a bitter quarrel on Christmas evening, 1910, at the wife's parents' home at Auburn, where they then separated, finally as the result proved. The wife and the child, who was then a little over three years old, remained with the wife's parents at Auburn and for some five months following the defendant refused and failed to contribute anything to the support of either, insisting that

they return to his home in New York city, which the wife refused to do. In May, 1911, he threatened to take habeas corpus proceedings to obtain the custody of the child, or at least the right to visit her, which up to that time had been in effect refused to him. Through counsel, on May 26, 1911, the parties entered into a written agreement as to the custody of the child for the next three years, to the effect that the mother should have its general custody, with the right to the father to see her, the child, at all reasonable times and to have the child, not to exceed four days in every month, sent for the day to the house of defendant's brother, a doctor, in Seneca Falls, to spend the day in company with the father; and upon such conditions defendant agreed to pay the plaintiff $200 a month for the support of the child. The agreement made no provision for the support of the wife and no contribution to that object was made by the defendant until the second agreement hereinafter recited.

On November 6, 1913, the plaintiff began in this court (Rockland county) this action for an absolute divorce against the defendant, who had continued to reside in New York city. He interposed a general denial as to the allegations of guilt in the complaint, and by consent of counsel the issues were referred and an order to that effect made by this court, at the Rockland Special Term, December 6, 1913. Both parties appeared before the referee by counsel, and evidence in behalf of the plaintiff was taken, which fully established defendant's guilt, the defendant offering no evidence in his behalf. On December 4, 1913, while the action was thus pending, the parties entered into a written agreement providing for alimony and the custody of the child, subject to the approval of the court. The substance of it was that in case divorce should be granted the plaintiff should have the general custody of the child, except that the father should have its custody for one week each month, from October to May inclusive, and two weeks each month from June to September inclusive, with the right to see the child at other times where she might be living; and that the defendant should pay to the plaintiff, in lieu of alimony and all right in his estate, the sum of $51,500 in five annual installments, the first, of $11,500, to be paid within ten days after the

entry of the final decree, and the other four, of $10,000 each, to be paid annually thereafter, and all to be secured by a promissory note indorsed by Julius Fleischmann; and also that the defendant should pay the further sum of $500 per month from the date of the entry of the interlocutory judgment, " for the education and maintenance of the said infant child and for her [meaning plaintiff's] own support," such arrangement to continue until and terminate on the 23d day of August, 1921, when the child would become fourteen years of age. That agreement was by counsel presented to the referee for his approval, which was formally given, and in his report in plaintiff's favor he reported it with his approval to the court. On December 27, 1913, interlocutory judgment was granted and entered, which in all respects confirmed the referee's report; and after the expiration of the statutory period of three months final decree of divorce of the plaintiff from the defendant, in usual form, was made and entered March 28, 1914. That decree recited that the referee's report had been confirmed, but made no other or direct provision as to alimony, and as to the custody of the child provided " that the plaintiff shall have the custody of Josephine, the infant child of the parties, but that the defendant shall be permitted to see said infant child at all reasonable times and said child shall be permitted to visit the defendant from time to time." The agreement had provided that the provision in the decree in regard to the custody of the child, should be "interpreted by the parties and be subject in all things to the following provisions " therein mentioned. The decree also contained the usual prohibition of the defendant, as the guilty party, from remarrying.

. On March 30, 1914, only two days after the entry of the final decree, defendant married, at Cincinnati, another woman, about thirty years of age, who was not a co-respondent in the action but was and is of most estimable character and family, and two children, boys, have been born to them.

On June 23, 1914, the plaintiff married Paul R. Clark, a bachelor whom she had known from her childhood. He was a practicing lawyer in Auburn and the attorney of her father.

The defendant made all the payments required by the

agreement of December 4, 1913, until October, 1914, when he set up the claim that, as the plaintiff had remarried, she should thenceforth be supported by her present husband, and that he, the defendant, should be required only to make such part of the said monthly payments of $500 each as might be required for the support of the child alone, and upon that theory he defaulted in that payment for October, 1914. Thereupon she, on October 25, 1914, began an action to recover it, and he, on November seventh following, began an action in this court against her and her present husband to charge them, as trustees, with the funds paid by the defendant for the benefit of the child, and to have them account therefor with the incidental expectation of thereby eliciting sufficient facts to warrant an application to the court to modify the divorce decree both as to the future payments and as to the custody of the child. No complaint in the action, however, was actually served or apparently even prepared. After a time, upon representations made by plaintiff's counsel that she was providing the child with a governess and with private instruction at her home, the defendant discontinued that action about the end of September, 1915. He made all the payments under the agreement due prior to the commencement of this proceeding. In connection with the discontinuance of such action, the defendant, in a letter written by him to his own counsel and by the latter communicated to plaintiff's counsel, said, in effect, that as long as plaintiff continued to provide for the child as she then was doing, he was willing that she should use as she pleased any surplus of the monthly payments of $500 each. Shortly, however, the plaintiff dismissed the governess and ceased the private instruction and began to send the child to a public school in Auburn. At first the defendant approved the sending her to that school, but later he objected to it and insisted strenuously that plaintiff should provide a governess and a private teacher. Plaintiff refused to accede to either demand, claiming that as she had no other child she herself was perfectly able to care for the child in all respects, and that it was very difficult in Auburn to obtain a suitable private teacher, and that anyway, in her judgment at least, it was better for the child, at her age and until she reaches

the age of fourteen, the limit of the said agreement, to attend the public school, which the children even of the best people of Auburn did attend. The controversy thus joined between the parties led to the institution of this proceeding on January 31, 1916.

At the coming on at Special Term of the motion herein for modification of the decree, the justice presiding filed a memorandum stating that he felt himself unable to decide the matter upon the voluminous affidavits and papers submitted, and that he would for several months be unable himself to take the testimony, and, therefore, that a referee should be appointed to take such testimony and report it with his opinion. Thereupon, February 28, 1916, an order was made at such Special Term appointing such referee. The hearings before the referee began on March 16, 1916, and continued quite constantly until they were concluded on June sixteenth following.

While, doubtless, the inquiry should have been confined by the referee to evidence tending to show changes in the condition of the parties since the entry of the decree, as that should ordinarily be regarded as conclusive of their status at that time, he nevertheless permitted a practically unlimited investigation into the antecedents of the parties and their respective families, going back throughout their lives and bringing to the light of a public record even all the criminations and recriminations of the parties, the one of the other, during the period of their differences, which had culminated in their separation and the final divorce action, all such proceeding being over the repeated but vain objection of the plaintiff's counsel. To my mind such procedure served no purpose or accomplished no result except to greatly prolong the reference — over 2,000 pages in this record — and to incidentally and quite unnecessarily reflect to some extent upon the character of both parties beyond the inferences usually to be drawn from the fact of a divorce. The mass of the evidence so taken, aside from the guilt of the defendant proven in the divorce action, certainly did not tend to establish that as to moral and intellectual fitness, or in parental affection, either party in comparison with the other is unworthy to have the custody of such a child in whole or in part.

On July 15, 1916, the referee made his report recommending, in substance, that the custody of the child should be given to the father, and that the mother should have merely the right to see the child " at all reasonable times " and to have the child visit her for two weeks during each month of the summer vacation, and also one week at Christmas and one week at Easter, " but accompanied by a companion or governess." The order appealed from confirmed the report of the referee practically, except the provision as to the child being accompanied by a companion or governess upon and during her visits to her mother. It gave the custody to the father with simply the said right of visitation to the mother.

A reading of the long report of the referee impresses one with the idea that the controlling consideration with him was that the father, by means of his much greater wealth, his far more pretentious homes in New York city and at Greenwich, Conn., and especially through the better educational and social advantages open to a person of means in that city than in Auburn, can give to the daughter a better station in life than the mother.

From the foregoing review of the leading undisputed facts, it is apparent that the provision in the decree as to the custody of the child was, when so made, entirely correct, although it was made by the agreement of the parties approved by the court and is to be construed in the light of that agreement. It was substantially what the court in all reasonable probability would then have made had that particular matter been contested before it. In that event the only alteration at all likely would have been that in view of the gross character of defendant's guilt as proven in the action—which demonstrated that at least during the latter part of the period of his separation from his wife he had lived in open defiance of even the ordinary proprieties, in that he had repeatedly, at his own apartments, apparently without even pretense of concealment, cohabited with abandoned women, not merely one, but at least two at different times—the court might well have very substantially restricted and lessened his share in that custody. Happily, his speedy marriage to an estimable woman and his subsequent exemplary life with her may now be regarded as having very largely removed or mitigated that

disparagement. It may be noted that I have thus considered the evidence upon which the divorce was granted, although the referee herein excluded it. Against the objection of plaintiff's counsel, he received a flood of evidence showing not only the life of the parties together as husband and wife, but also their antecedents and actions, of almost any and every nature, upon the theory that anything of the sort might have a bearing upon the problem of their comparative fitness for such custody. Upon that theory it would seem manifest beyond all sort of cavil that no evidence could be more competent or material than that establishing defendant's guilt in the divorce action and showing its character as gross and continued and not casual, temporary and exceptional. The referee, upon his own theory of the trial, clearly erred in excluding that evidence, and as it appears in the record as an exhibit marked for identification, I have felt at liberty thus to refer to it.

The conclusion that upon the then merits the final decree was right as to the custody, or at least gave the defendant no cause for just complaint, is especially pertinent because of the basic contention of counsel for respondent that, as the provision in the decree relating to custody was really the result of the agreement of the parties and not of an independent determination by the court, that provision should not here, upon this inquiry, be accorded its usual weight. My such conclusion is based upon the following considerations, viz.:

(a) The defendant was the guilty party. It is well settled that in general the custody of the children of such parties, especially of the only child, will be given, not to the guilty one, but to the innocent.

(b) The mother, the innocent party, was personally worthy and, especially with the provision made by such agreement for her and for the support of herself and child, was amply able financially to care for the child properly in all respects. The provision under the agreement, which was approved by the referee and in effect by the court, gave to her for herself practically outright the sum of $51,500, payable at once or through promissory notes secured by good indorsement, then at once delivered. In addition, she was by that provision

secured a sum of $500 a month for the support of herself and the child, which by itself was ample for both purposes. Besides, she possessed some substantial fortune of her own, about $15,000, which apparently had not come to her from the defendant.

(c) The child was a girl only about seven years of age, and so especially needing the care of the mother.

(d) Through all the period of the two years' separation of the parties, the child had lived with the mother and she had had its general custody.

Under those circumstances, to have taken the general custody of the child from the mother, the plaintiff, and have awarded it to the father, the defendant, with only the right of occasional visitation reserved to the mother, would have been a thing unprecedented and to any well-balanced and unimpassioned mind intolerable. The order appealed from now undertakes to do that very thing. If it can be sustained, it must be simply because there has been in the situation of the parties, since the entry of the final decree, some very decided and substantial change or changes which warrant the transfer of the general custody of the child, who is still only in her tenth year, from the mother to the father. As to any such change, the evidence suggests only three of any possible substantial weight, namely:

(1) The subsequent speedy marriage of each party with another person and the consequent assumption by each of new obligations and attachments.

(2) The material increase in the defendant's wealth.

(3) The refusal of the plaintiff to heed the demands, or at least suggestions, of the defendant as to the method of the care and education of the child.

Apparently both parties recognize that the child has not even yet reached an age where her own inclinations or preferences, if any, as between her parents, should be ascertained or even considered. I do not see that any effort in that direction was made by the referee.

As to the first such element or factor in the problem, namely, the subsequent marriages, each married so speedily after the entry of the final decree as to indicate that each may, before that event, have intended to take that course.

The defendant married, not the co-respondent, or rather none of the co-respondents, but a concededly respectable and worthy woman, who has already borne him two sons and with whom he has lived an entirely exemplary life. No doubt the defendant's present wife, with her two children, has made his home much more suitable as a home for his daughter than it would have been had he remained unmarried.

I do not think that the fact that he married again in another State, when the decree forbade him to marry again, should be taken as seriously disparaging his character. Our courts have practically held that such prohibition, existing by our law, is not effective beyond the limits of the State, which is tantamount to holding that such law and such decree in that respect are applicable or effective only within such limits. The law, as thus construed, certainly imposes no penalty or disability for the violation of its prohibition by such marriage without the State, even if the same be technically a violation. A law without any penalty or liability for its violation is, for all practical purposes, no law at all. I think, therefore, that defendant's such marriage has, under the circumstances, not impaired but rather has to some extent increased his fitness to have or share in such custody.

As to the plaintiff's, the mother's, re-marriage, I do not perceive that it has diminished her just claim in that regard. Her present husband appears to be an entirely worthy man. He is a lawyer, practicing in Auburn, and was the attorney of the plaintiff's father, and has been for many years a friend of that family. He has held respectable official positions in that locality — postmaster of the city for many years and an assistant district attorney, and in his earlier life as secretary to the late distinguished Congressman Sereno E. Payne and later as his law partner. The learned counsel for the defendant saw fit, upon his cross-examination, to force him to admit that he had never argued a case in the Court of Appeals or the Appellate Division, except a single case in the former, and had rather rarely tried cases in the Supreme Court, and that counsel in his brief appears to contend that those facts indicate the comparative worthlessness of the man. From our own experience we know well that many excellent lawyers rarely, if ever, appear personally in court and yet do much

business and bear good professional reputations with the bar and people generally.

The defendant and his counsel seem to think that the defendant some way had the right to expect that the plaintiff would never marry again and would, at least for the term of the agreement, devote her entire life to the care and nurture of the child. I cannot see that he had any right to indulge in any such anticipation, even if the plaintiff at the time of the making of the agreement so declared her intention. Quite possibly she may then have thought that her matrimonial experience already had was sufficient for a lifetime. However, considering her age, her continuing throughout life unmarried would be unnatural and perhaps against a sound and reasonable public policy.

The apprehensions of defendant and his counsel, approved evidently by the referee, that the affections of the child, if she remain in the plaintiff's home, are very likely to be alienated from the father, to her material prejudice, by reason of the hostility to him of the people there, namely, the plaintiff, her mother, brothers and present husband, do not appear to me to be well founded. No doubt their feelings are really unfriendly towards the defendant, as from their point of view they cannot well fail to be. That situation is one of the inevitable consequences of a divorce secured upon real grounds, as this appears to have been; and with the utmost care some appreciation of such sentiments must come to such a child with her advancing years, and especially as a result of this controversy and of the protracted reference, of which, in the very nature of things, she must know something. It is, of course, and will be the imperative duty of each party, while having the custody of the child, to very rigidly abstain from any unfavorable comment in reference to the other, and very likely that end may best be secured by refraining as far as possible from any comment whatever about the other. I perceive in the record only one fragment of evidence of any breach of such obligation upon plaintiff's part or upon that of her people, and that consists in the fact that when one of the nurses in the mother's present home said to the child, upon one occasion, that she should do what her father had told her to do, the mother said to the nurse, apparently in

the presence of the child, that she should not bring his name up in that way as she was bringing up the child. That incident, however, was in January, 1912, during the separation, and long before the agreement or the divorce. Considering the controversies which have prevailed between the parties so much of the time since the divorce, and this long and trying proceeding, with its evident stimulus to ill-feeling, it is perhaps remarkable that the mother has transgressed so slightly in that respect. Still, both parties for the future should be held to a strict observance of their duty in that regard as above defined.

It is perhaps too much to expect that, under the circumstances, either party will be entirely fair and sensible in judging of the present conduct of the other. A striking illustration of this is presented by the father's apparent complaint against the mother for teaching or at least permitting the child in the mother's home to call her present husband " Uncle Paul," while it appears that in his home the child uniformly calls his present wife "Aunt Janie," with his entire approval and even direction. The practice in each case evidently has the same merit or demerit, and probably would be considered by most people to be entirely proper and possibly to constitute a happy solution of an embarrassing social problem.

In short, I do not think that the subsequent marriage of either party has substantially affected the merits of the care and custody of the child. While it is true that such marriage of the father and his subsequent family life have in that regard improved his situation, I cannot conclude that such improvement has been at all sufficient to overcome the superiority of the mother's claims or merits as they stood at the time of the decree as above recited.

As to the increase in the father's pecuniary means, it appears that his income has been substantially enlarged until it now amounts to the sum of $60,000 a year, which, however, is an increase of only about $10,000 since the making of the agreement. I do not perceive in the record any justification for the claim, apparently made by his counsel, that he is now or is likely ever to be of large fortune, at least not according to the ideas now prevalent in this community. His such income consists very largely of the earnings of his personal services, and in the very nature of things would cease with

his death or disability, or very shortly thereafter. With the expenses of maintaining a home in New York city with six servants, and another upon a large farm at Greenwich, Conn., both evidently expensive establishments, and with his considerable expenditures for life insurance to provide for this child and various of his relatives, in which direction he has been and is being most liberal, and with the large sum paid and to be paid to the plaintiff under the said agreement, it does not appear that out of even so large an income very much can remain for annual accumulation.

However, even if his wealth was very large or likely soon to become such, so that he could afford to provide his daughter with expensive aids to education, artistic as well as substantial, and to social opportunities much beyond what the mother's environment in the comparatively small locality of Auburn can furnish, I cannot feel that the situation and those attendant advantages can, at the child's age, compensate her for the loss of the mother's care and companionship, or of so much thereof as the order appealed from necessitates. If the father were really so very wealthy, that fact might afford ground for the court to increase the allowance to be made by him to the mother for the support of the child, so that she might be reared in harmony with her father's station in life. At present, as the evidence really shows his pecuniary condition, it would appear that the monthly allowance of $500 is ample for the support and education of the child in any event. In addition to making the payments for that purpose required by the agreement, the father has from time to time, principally at her visits with him, made to her expensive presents, at a cost of several thousand dollars, consisting largely of fine clothing. Indeed, the evidence serves to arouse a substantial suspicion that the plaintiff, mindful of his disposition in that regard and with some exercise of worldly wisdom, has, in sending the daughter to him for her visits, failed to array her in her best clothing, perhaps in the expectation that his generosity in that respect would supply all deficiencies, real or apparent. Such expectation, if entertained by her, has certainly not been disappointed. It would seem, however, that the monthly payments of $500 will be sufficient for the child for all purposes.

The mother, having married again, is now under no necessity to apply any part of that allowance to her own support, although originally it was designed for the support of both the mother and the child. The evidence does indicate that she has been somewhat parsimonious in her expenditures solely for the benefit of the child — that, indeed, those have amounted to only about $600 a year, or perhaps even less, out of the $6,000, the aggregate of the $500 a month payments. In the accounting which the referee required her to make, she charged against the child a proportionate part of the up-keep of the home. It may be better, however, in the future, for her to charge the child a certain sum per week or month to cover the cost of her general maintenance, although the practice so followed is by no means exceptional and warrants no such condemnation as it received from the referee.

In this connection it may be well to notice an argument which appears to have had great weight with the referee, viz., the contention that the father is somehow a very great man and, therefore, so superior to his former wife that the association of the child with him rather than with her will greatly and much more advantage the child in her education and general development. While it is apparent that the father's professional career has been very creditable, yet I do not perceive that he merits so extreme a eulogium in comparison with the mother. He was the son of country people, entirely respectable but of small means. Largely by his personal efforts in teaching school and otherwise, he acquired a substantial, liberal education, and was admitted to the bar. He married a young woman of the general neighborhood, the daughter of a similar country family although of perhaps better pecuniary circumstances, and came to New York city and there undertook the practice of his profession. He specialized in corporation practice, secured a valuable client therein and so attained in some sixteen years to his present position in the metropolitan district. Such advancement, while notable, is not by any means unique. There are others in the same class. Indeed it is sometimes said, probably with some warrant, that many of the leading lawyers of that district come from the country and progress through somewhat similar careers. In such a career and position I can see no warrant for the belief that

the personal association of the father with his child, a daughter of such age, will promote her mental and moral development more than the like association with the mother, even if, as very often and perhaps usually happens in such cases, she did not during the married life advance in mental strength and worldly experience as much as he did.

As to the third element of change above stated, namely, plaintiff's refusal to heed defendant's requests and suggestions as to the manner of the education of the child, I think that in the main those were reasonable and that the plaintiff should have complied with them. Indeed, to my mind this topic constitutes the only real subject of consideration which this proceeding has ever presented. The child now is nearly ten years of age, and of course the question of her education has become an active and very important one. It is quite likely that the father's larger experience in life and consequent wider field of view make his judgment in that regard better than that of the mother. At least it is valuable and entitled to respectful consideration. For some time before this proceeding was commenced, his insistence was that the child for her general education be sent to some suitable private school for girls, or have private tutoring in the mother's home. Although for a while the mother undertook to comply with his such views, she had for some time, upon various grounds, refused absolutely and with rather scant grace to do so, and had sent and still insists upon sending the child to a public, common school in Auburn. With a patience which would have been most exemplary if the matter had been of any real importance, the referee took a perfect flood of testimony as to the character of that school. In his report he exhibits great concern over the fact, shown by the evidence, that the children of all classes in Auburn, the rich, the poor, the laborers and even a few of the colored people, attend the school. Representatives of various of the best families of the town testified, in plaintiff's behalf, in most loyal defense and high appreciation of the school. Very likely it is a model institution of the kind. But I do not think that we are called upon to adjudicate its merits or demerits. The plain situation is that it is utterly impracticable for this child to attend any school, public or private, and be absent therefrom anything

like one week in every four upon visits to her father at a distant place. This is to my mind a self-evident proposition. Certainly no one who has ever taught school, as I chance to have done, can fail to recognize its absolute, conclusive character. It is manifest that even the mother herself appreciates it. The mother obtained from the father his consent to the liberal provision made for her at once, and for the future support of herself and the child, upon her consent that he should have such visits from the child at his home, and she at least should not insist upon any system of education which will render those visits impossible. With those visits maintained substantially as they have now been restored by this court pending the determination of this appeal, the only practical system of education for the child in the mother's home is by private tutoring. No class of several in any school, public or private, can be conducted at all successfully with one pupil absent one week out of every four, or two out of every eight. The decree, construed in the light of the agreement, as it should be, gave to the father the right to those monthly visits, and I perceive no just ground for taking from him the substance of that right so long as he is able and willing to pay the increased cost of the child's education necessitated by those visits. If the child may receive her education by private instruction in her mother's home, at least until she reaches the age of fourteen years, the term of the said agreement, the interruption of her education by such visits with her father will be of the least possible harm, and this seems true especially in view of the precociousness of the child, which despite the disturbances to which the differences of her parents have subjected her, has now placed her, in educational status, a year in advance of children generally of her age. It is evident that the mutual affection between the father and the child is very ardent, and that, with all his faults, he is manifestly of strong mentality, and that his considerable personal association with the child is quite likely to be of great value to her. Therefore, I think that, all things considered, it will be better to continue such frequent visitation, although ordinarily I would be very reluctant to advise or approve such a course. I think, however, that it will be better to provide, for the future, that those visits shall be for two weeks at the

end of each two months during the ordinary school year period, instead of for one week each month. That will afford her a continuous term of six weeks for study with her tutor or tutoress and diminish substantially the harm of such frequent interruption of her course of instruction.

The leaving of the matter of such visitations so indefinite as the phrase in the agreement, viz., " consideration being given to the child's health and the possibility of interference with her education," would inevitably result in further misunderstanding and controversy between the parties, which could not fail to be disadvantageous to the child. Therefore, whatever right of custody be granted to the father, he should have definitely and absolutely, and the order in that respect should be precise.

The fact that the mother has been unreasonable in refusing the father's such reasonable requests as to the education of the child does not, in my opinion, warrant the practical turning of the decree around so as to make it award the general custody to the father and the right of visitation merely to the mother. Perhaps, after all, the father's present insistence that he shall have the general custody is at least quite as unreasonable as her such refusal.

The referee closed his report with a wise or at least worldly wise admonition to the mother that she ought to sacrifice her feelings and forego her happiness in the care and nurture of her only child, although still of somewhat tender years, in order that the father's affection for the child may not wane, and that the child in her father's present family may have the advantage of his greater wealth and position in securing for her better facilities in the way of education (general) and in music, art and dancing, and in opportunities for social advancement. The philosophy of this teaching, if carried to its logical consequence, would justify the State in taking away from parents of little means a precocious and promising child and giving it to others who, by means of their greater wealth, could give it greater such material advantages. That philosophy has never yet been accepted in this country and I think is not likely to be. That admonition, being interpreted, meant, doubtless, that the mother should accept the determination of the referee. This appeal, however, indi-

cates that she has rejected it, as quite naturally she might do. It seems to me that the admonition was unwarranted by the merits and in plain excess of the proper function of the referee in that respect, which was limited to advising the court.

In the solution of this problem of custody, the interests of the child must be the paramount consideration. There has been much judicial writing to this effect, and indeed some of such opinions cited by the learned counsel for the respondent in his brief appear to go so far as to declare that to be the exclusive consideration. In this latter view I do not agree, as I maintain that the natural right of the parent, certainly where it has not been forfeited by gross misconduct, is also an important factor in the determination of the question, and it may be, perhaps, that the interests of the child in a broad sense embrace the due observance of such right.

It is my conviction that the interests of the child here will be best promoted by modifying the decree only to the extent hereinbefore approved. Therefore, I advise that the order appealed from be modified so as to provide:

(a) That the plaintiff, the mother, shall have the care and custody of the child, except that the child shall visit with the father the last two weeks in each period of two months from October to May inclusive, and the last two weeks of each month from June to September inclusive.

(b) That, in addition to the monthly payments provided for in the agreement of December 4, 1913, the defendant shall defray all the expenses of the child's such visits, including transportation to and from plaintiff's home.

(c) That the plaintiff, out of the said monthly payments, shall, beginning with October first next, provide the child with private instruction at her home by a private tutor or tutoress, and that the child shall not attend the public school after the present current term. Such a tutor or tutoress may readily be obtained from outside of Auburn, if not from within.

(d) That this arrangement as to custody, visitation and instruction shall continue until the 23d day of August, 1921, when the child will be fourteen years of age, and that then either party may apply to the court for further provision as to the same.  ·

I also advise that the order, as so modified, be affirmed, without costs.

JENKS, P. J., STAPLETON, PUTNAM and BLACKMAR, JJ., concurred.

Order modified in accordance with opinion, and as so modified affirmed, without costs.