THE PEOPLE OF THE STATE OF NEW YORK ex rel. HAROLD SANFORD GLENDENING, Relator, *v.* ALICIA MADDOX GLENDENING, Respondent.

Supreme Court, Special Term, New York County, January 27, 1936.

*Paul W. Williams*, for the relator.

*Winthrop, Stimson, Putnam & Roberts* [*Walter J. Holzka* and *Allen T. Klots* of counsel], for the respondent.

GAVEGAN, Official Referee. The issues of fact and law on a motion to modify an order of this court, entered May 10, 1929, awarding the sole custody of the son of the parties to the father, with certain rights of visitation to the mother, which order the mother consented to, have been referred to me as official referee to hear and report, pursuant to an order of Mr. Justice CHURCH entered August 19, 1935.

Those issues duly came on to be tried before me at the several hearings, from the 7th day of October, 1935, to the 6th day of November, 1935, inclusive. Further evidence was received by stipulation in December and on January 6, 1936, a motion was made and granted for leave to reopen the hearing, in order to add still further documentary evidence to the record, circumstances which have delayed the preparation and submission of this extended report. The proofs of the respective parties have been duly adduced and considered.

Due deliberation having been had hereon, I submit the following report and recommendations.

Section 70 of the Domestic Relations Law governing the award of custody as between parents on habeas corpus provides that " In all cases there shall be no *prima facie* right to the custody of the child in either parent, but the court shall determine solely what is for the best interest of the child, and what will best promote its welfare and happiness, and make award accordingly."

The relator and respondent intermarried in London, England, on June 28, 1922, when they were twenty-six and eighteen years of age, respectively. One child was born of the marriage, namely, a son, Alan, on July 27, 1923, in Paris, France. Alan is now

twelve years of age. On July 14, 1924, the father and mother became residents of New York county and the father has at all times since remained a resident of said county.

The father and mother continued to reside together in New York city until February 11, 1925, when the mother left the relator and the infant Alan, following what appears to have been their first serious quarrel, and refused to return to their home. There is a sharp conflict in the testimony relating to this quarrel, but evidently the wife's resulting aversion to her husband proved stronger at that time than the mother's love for her child. Not trusting to time to heal the breach, the respondent claims she was justified in leaving her husband, less than three years after their marriage and when the child was less than two years of age. The relator pleads great provocation and extenuating circumstances for his part in the quarrel. His humble apologies and appeals for forgiveness, written in the hope of reconciliation, were of no avail. Since that time they have not lived together.

If the respondent was justified, as she claims, in leaving her husband, she could have prevailed in an action for separation in this State, awarding her the custody of the child, if that was all she wanted. But she wanted more. She wanted to be rid of her husband as well, and evidently believed that, by reason of her financial independence she could accomplish both ends with impunity.

Since their separation the father has tried repeatedly to induce his wife to resume their lives together, for the sake of their child, but he has failed in what has been an almost continuous endeavor. The mother, however, has found these efforts at reconciliation most distasteful, and characterizes them by such fantastic terms as " annoyance," " harassment " and " persecution." While " the occasion, cause and circumstances of the separation * * * may be taken into account " in determining the question of the child's welfare (*People ex rel. Sternberger* v. *Sternberger*, 12 App. Div. 398), the conflicting testimony referred to above points to this first quarrel as merely the climax of the wife's aversion to her husband, the origin and growth of which are clearly traceable to the wide difference between them in education, financial resources and social inclinations.

During April and October, 1925, the mother asked the father for an arranged divorce, but the father was opposed to it because of the harmful effect he believed it would have on the life and upbringing of Alan. The father notified the mother that he would take no part in proceedings which would deprive Alan of a home to which he felt the child was entitled.

On May 3, 1925, the father took Alan to his mother's home in the country at Norwalk, Conn., about forty-two miles from New York city. Thereafter a habeas corpus proceeding was brought by the mother in Connecticut through her then attorney, Homer S. Cummings, and upon the return of the writ an order was entered upon consent on May 29, 1925, granting the custody of Alan to the mother and further providing that the father should have certain rights of visitation, for a period of two weeks in the fall of 1925, also for a period of two months in the spring of 1926, beginning at such date as he might select, and for a further period of four months during each twelve months commencing June 1, 1926.

The mother left the State of New York August 5, 1925, and went to Reno, Nev., taking the child with her, all without the father's knowledge or consent. She left the State of New York with the intention of acquiring a residence in the State of Nevada and for the sole purpose of procuring a divorce. Knowing that a divorce decree obtained in Nevada without appearance on the part of the father would be invalid in the State of New York, she attempted to procure such an appearance by offering the father the sum of $75,000. The father refused and has continued to refuse to accept any money from the mother on the basis of such a consideration. In the spring of 1926 she sent the child from Reno, Nev., to New York, in charge of a nurse, to visit his father under the terms of the Connecticut consent order.

On September 11, 1926, the mother procured a Nevada divorce by default. The father did not appear personally or by counsel in the divorce proceedings, nor was he served with process in the State of Nevada, nor has he ever been in the State of Nevada. In the same month of September, 1926, the mother returned to New York city and took up residence at No. 14 East Sixtieth street, borough of Manhattan. From 1925 to 1928 the father exercised his right of visitation by having Alan four months of each year. During the summer and fall of 1928 the father made arrangements for his son Alan to be admitted to the Lincoln School, a private school owned and operated by Teachers' College of Columbia University.

In order to avoid interruptions in Alan's schooling, the father desired that modifications be made in the Connecticut order of May 29, 1925, so that Alan should be kept in the city of New York during the school year and the father could see him at week-ends or other convenient times. As a result, the following agreement in writing was made on November 10, 1928, between counsel for the mother and father and approved by the parties:

" 1. Mr. Glendening is to see Alan twice a month, that is, every other weekend while he is at school, Alan to be sent to Mr. Glendening's quarters Saturday afternoon immediately after lunch and to remain with him for two or three hours, as may be arranged at the time, Mr. Glendening to have the privilege once a month to take the boy with him to Mr. Glendening's mother on a weekend on one of these semi-monthly visits, taking him after lunch on Saturday and bringing him back early Sunday evening. In case of illness Mr. Glendening is to be notified, so that he can go at once to see Alan.

" 2. Mr. Glendening is to have Alan with him on half of the holidays, Mrs. Glendening having him the other half. This includes the summer holidays.

" 3. Alan is not to be taken out of the Lincoln School or any great distance from New York without consultation.

" 4. Mr. Glendening is to pay or reimburse Mrs. Glendening for one-half of Alan's tuition at the Lincoln School."

In spite of this written agreement not to take Alan out of the Lincoln School or any great distance from New York without consultation, on January 30, 1929, the mother wrote a letter to the father to the effect that she was leaving New York to be gone indefinitely. She concealed their whereabouts from the father, and only through another source did the father discover two months later that she had taken the child to Panama. During this period the father was unable to obtain any information from the mother's counsel as to where his son was. He was deprived of all opportunity to see Alan from January 26, 1929, until June 1, 1929.

On April 20, 1929, the mother returned to New York city for the purpose of consulting her physician, but left the child behind in Panama in the home of friends, residents of that country. On May 1, 1929, the mother was served with a writ of habeas corpus, returnable before a justice of this court on May 7, 1929. After adjournment the proceeding was not tried, but an order was entered on consent of the parties and their attorneys on the 10th day of May, 1929, which is the order the mother now moves to modify and which provided as follows:

" 1. The sole charge, education, care and custody of the infant, Alan Sanford Glendening, shall be awarded to his father, the relator, Harold Sanford Glendening, until further order of this court. On February 1, 1930, the parties hereto shall consider whether the best interests and welfare of the said infant require any change of care and custody, and if the parties shall not agree, the matter shall be submitted to this court for determination.

" 2. The mother, Alicia Maddox Glendening, shall give the custody of the said infant, Alan, to his father, on June 1, 1929.

" 3. The mother, Alicia Maddox Glendening, shall have the right to have Alan with her during the summer vacation from the 1st day of August, 1929, until the 15th day of September, 1929, and during the second half of the Christmas holidays from his school, which, however, shall not include December 25, 1929.

" 4. After the beginning of the Fall term of the Lincoln School, which school it is contemplated that the said infant shall attend next Fall, the mother, Alicia Maddox Glendening, shall have the right to see the said infant and to have him with her for a period of three hours on Saturday afternoon twice a month from 3 o'clock to 6 o'clock.

" 5. In case of illness of the said infant, or any other emergency, the said mother, Alicia Maddox Glendening, is to be notified at once and permitted to see him and be with him.

" 6. Neither party shall remove the said infant from the State of New York or from the jurisdiction of this court at any time without the written consent of the other, except that the father shall be permitted to take the said infant to his mother's home in Norwalk, Connecticut, a distance of about forty-two miles from New York City, and either the mother or the father may take the child during their share of the summer vacation, to an appropriate place in a State of the United States, which is contiguous and adjacent to the State of New York.

" 7. Neither party shall conceal the whereabouts of the said infant from the other at any time, but must keep the other party informed of the whereabouts of the said child at all times."

During all these years this order has never been changed, although it provided for a change " of care and custody " to be considered February 1, 1930. No change was applied for. The respondent has violated its terms instead of moving to modify it, until she was served with a writ to answer for said violation.

The father has continued to maintain the same home and living conditions for Alan since September, 1929. The mother makes no criticism with regard to this home and I find that it has been physically adequate in all respects for the boy. At the present time the father has a larger and better apartment. The same mature woman who has acted as governess and housekeeper and has been responsible for Alan's care since January 1, 1930, is still looking after him. The mother has approved of the qualifications, ability and character of this governess, Baroness Le Fevre by name.

The mother has continued to claim that she is a divorced woman, although at the time of the Nevada default decree she was advised

by eminent counsel that her Nevada divorce was not valid in the State of New York and that in the eyes of New York law the father is still her legal husband. She so testified.

The respondent has separated herself physically and spiritually from her child for long periods of time, even longer than a year. She did not see Alan from April, 1933, until May, 1934, and saw him only twice for a few hours during the year and a half from April, 1933, until November, 1934.

From October, 1932, to April, 1933, the mother lived in Washington, D. C., returning to New York periodically to avail herself of the right of visitation under the order of May 10, 1929. In April, 1933, she went to England and there met one Victor Llewelyn, with whom she returned in June, 1933. She proceeded from New York to the State of Nevada, where she went through a ceremony of marriage with said Victor Llewelyn seven years after procuring the default divorce in that State. In July, 1933, she went abroad to England to live indefinitely with Victor Llewelyn, arranging for the lease of a house in London for a term of years and taking all of her possessions along, with the idea of making England her permanent home. When the mother went to England with him in the summer of 1933, she made attempts by letter to bring Victor Llewelyn into her son's life and wrote Alan that she had given him a " new father." She continued to live with Victor Llewelyn from June, 1933, to May, 1934, when she returned to this country. No issue resulting from that union, the mother apparently experienced a renewed longing for her only child in America. In August, 1934, she went back to England and lived in the same house with Victor Llewelyn until September, 1934, but they did not then live together as husband and wife.

In October, 1934, the respondent left Victor Llewelyn and returned to this country. Victor Llewelyn has brought annulment proceedings against her in England. She has signed papers to facilitate a decree against herself in the annulment proceedings and is making no opposition to such decree.

In 1934, after the mother's Nevada marriage to Victor Llewelyn ended disastrously, the father treated her generously and allowed Alan to visit with her for the whole of the Christmas vacation and an indefinite period thereafter. After this privilege had extended to February, 1934, however, the father reminded the mother by letter that the existing court order was still in effect.

When Alan was sent to his mother on December 21, 1934, he was in good physical condition. During the months of January, February and March, 1935, while under his mother's care, Alan had a series of illnesses culminating in a mastoid operation on March 27,

1935. He remained in the hospital until May 10, 1935. The father concedes, however, that during this period of illness the mother's care and solicitude were beyond reproach.

In June, 1935, the mother took Alan away for a whole summer, without consulting the father and without his permission, to a place which under the circumstances was inaccessible to the father. In June and July, 1935, the mother and her attorneys refused to assure the father that he would have Alan for a share of the summer vacation, or that he would be returned to live with his father at his home in September, 1935, or that Alan would be restored to his class in Lincoln School.

The father, on July 27, 1935, caused to be served on the mother a certified copy of the court order of May 10, 1929, and a personal demand dated July 12, 1935, requesting that Alan be restored to the relator; that the father have Alan for his share of the summer vacation of 1935; that the mother consent to the restoration of Alan to the school which he has been attending for the past seven years; and that Alan be restored in September, 1935, to his father's home where he has been living during the most of the past six years. Thereupon the mother brought on the present motion, asking for a modification of the custody order of May 10, 1929. Pursuant to the order of Mr. Justice CHURCH, dated August 19, 1935, holding that the order of May 10, 1929, was still in force, Alan was restored to the custody and home of his father for the opening of the school year on September 21, 1935, and has been with him with visitation rights to the mother, under said order, ever since.

The father, since June 1, 1929, has continued to provide Alan with a good home and education and has not been willing at any time to give up his son. The mother, since 1925, has sought her own pleasure and happiness, most of the time evincing scant concern for the welfare and happiness of her child.

The father has at all times complied with the terms of the Connecticut order of May 29, 1925, the agreement between the parties and attorneys of November 10, 1928, and the order of this court, entered May 10, 1929. During the five school years from September, 1929, to June, 1934, while he was under his father's control and care, Alan has maintained excellent health and an excellent school record. In the summer of 1934, the mother, through her attorney, asked that Alan be sent away to a boarding school, to which the father refused to give his consent.

I find after talking with the boy that he is now receiving proper care, education and attention from his father and that he is living in good physical surroundings.

The respondent has shown an unwillingness and has failed to abide by the order of this court, and also has broken agreements entered into by herself and her attorneys. She was at all times represented by eminent counsel and must have known that she was bound by the terms of the court orders, whatever her attitude might be toward agreements. My interview with Alan has only confirmed the belief that he should remain in the custody of his father during the school days of adolescence, although for reasons easily understood he would prefer the more elaborate home his mother is able to provide. At his present age of twelve years, he needs the supervision and guidance of a parent with his father's educational qualifications, just as he needed tender maternal care at six years of age, when his mother consented to the father's sole custody. Since, unfortunately, he cannot have both at this time, and a choice must be made, there is an additional reason for the need of paternal guidance at his present age, for his official school reports show that Alan lost most of his school work during the time when he was with his mother, while they show that he did excellent work and made wonderful progress while he was with his father. The following are some of the fragmentary comments from said reports:

" He still needs help to acquire a sportsmanlike attitude when disappointed and more general consideration of others. * * *

" He is gradually learning to take the social consequence of selfish attitudes. * * *

" He needs to be more thoughtful of other people as shown in a tendency to tease and make remarks about the other children.

" Alan has still many virtues to acquire. He is aggressive and intolerant as well as domineering in his relationships. In social situations he must learn to respect the rights and privileges of others and to be courteous to those who deal with him."

These reports alone indicate to my mind that Alan needs discipline and guidance under the supervision of his father during his school years. More weight may be given to the boy's preferences at some future time and at some salient point in the course of his preparatory schooling.

Alan is now in the seventh grade, junior high school. The father has unusual qualifications to supervise the education of his son. He was educated and holds degrees from Dartmouth College, Columbia University in New York and Oxford University in England. He is a member of the New York bar, associated with a well-known law firm.

On the other hand, the mother has never had any schooling. Her education consisted entirely of private instruction by governesses

and tutors, extending only to her sixteenth year, after which she says she specialized in music. She is evidently a woman of culture and refinement, but, through no fault of her own, she lacked the advantages of those associations and contacts to be found in a school where pupils learn not only from teachers but from one another; where they learn not only about privileges but also about rights, duties and obligations; where they learn to give and take and respect the rights and feelings of others and practice forbearance and avoid intolerance. She now admits that this type of education does not " equip one for the outside world " and she would not approve of it for the boy. This handicap in her training I think explains in part the mother's attitude with regard to the legal rights of the father. In my opinion this difference in education is sufficient alone to justify leaving the boy in the father's custody during his school days.

Attention should be given to the respondent's charge that in insisting upon the custody of the boy at this time the father is actuated by mercenary motives. If this charge were sustained by the evidence it would disqualifyhim for such custody.

The income which the mother has received from 1928 to date and still receives, comes entirely from a trust fund under the will of her mother, Alicia du Pont, of which she is the sole income beneficiary. If she has no other children the entire corpus of this trust fund passes to the son, Alan Sanford Glendening, in the event he should survive her. It appears that the mother's income from this trust fund has averaged about $70,000 annually for the past five years, while the father's income in the form of salary working for a law firm is $5,000 a year, subject of course in both cases to income tax.

Out of this income the mother spent a total of from $6,000 to $8,000 on Alan in all the years from 1929 to 1935. The father has spent virtually all of his income during these years, 1929 to 1935, in supporting Alan, maintaining a home for him and giving him an education and there is no testimony reflecting on the father or on the way in which he has provided for Alan's health, welfare, happiness and education. Following is some of the testimony bearing on this question of mercenary motives:

The father's request in May, 1934, that the mother pay him $20,000 a year to support an eleven-year old boy with it although he could not explain how he could spend that sum on the boy, is answered by the father with the statement that this was only a figure for discussion and negotiation, that a much smaller amount would have been accepted, that he himself would have no control of it after the boy attained his majority and that any part of any such income not spent would be deposited and held in behalf of

the boy pending his majority, since he will not benefit by the trust fund unless he survives his mother, and in the meantime would be dependent upon her largesse.

The mother contends that the father has been using the boy as a pawn to extort money from her. The father contends that she has been using Alan as a pawn to exact from him a validation of her Nevada divorce — a matter relating to her own freedom of action and of somewhat doubtful relationship to the eventual welfare of their child. If she had shown a willingness to insure her son against want during her lifetime, in the event of her remarrying and having other children, by assigning to him some small share of her ample income, without bargaining, through counsel, with the father over a matter relating to her freedom to remarry, more weight might be given to this charge of mercenary motive and extortion.

Many things may happen affecting this son's well-being during her lifetime. It is not impossible that he should incur the displeasure of his mother, a temperamental woman, by marrying against her wishes. She might disapprove of his wife and relatives-in-law. Unless and until he becomes self-supporting, a result more likely to be achieved in the custody of the father than in the custody of the mother, he would be mostly dependent on his mother, who receives more income in a single month than his father earns in an entire year and who has a life expectancy extending long beyond the boy's majority. She could if she chose refuse to help him out with even a small part of her life income from the trust fund, the entire corpus of which passes to him should he survive her — unless he avoided his own father, her adversary, against whom she feels such deep aversion, thus alienating the affection of the son from his father.

If the mother marries again and has other children it will reduce Alan's inheritance to a proportionate share instead of the entire corpus of the trust fund. Indeed she will have the power to practically disinherit Alan in such event, for instead of his sharing equally with such other children she may dispose of the corpus of the trust fund " in such shares as she may have provided by her last will and testament."

In the face of these and other contingencies which may arise it would be unwarrantable to hold that the father was actuated by mercenary motives in his efforts to have the mother give at least some part of her income to the boy during his and her life in consideration of the father's concession on the question of custody.

It seems to me that a complete final answer to this mercenary motive charge is contained in the testimony showing that when the

father's salary was $35 a week, the mother offered him through her counsel the sum of $75,000 if he would consent to an arranged divorce. He refused the offer and this testimony stands uncontradicted. Far from being charged with mercenary motives, in my opinion the father should be commended for his solicitude and foresight on behalf of his own son.

With parents estranged, the boy's livelihood should not be left dependent upon the mother's approval or even upon her affection. It is incongruous that this son, who, surviving his mother, is to come into a large fortune, should in the meantime all during her life be subjected to the danger of incurring her displeasure and losing her affection, already proved unstable.

The court might well consider whether as life beneficiary she should not provide out of her bounty a reasonable sum annually during her lifetime for her boy's maintenance, under proper safeguard, as a condition precedent to visitation rights. The probability of the boy being drawn more towards the mother, after attaining his majority, by reason of her greater resources, is all the more reason why the father should have Alan's custody and supervise his training during his minority, instead of being penalized because of his inability to compete with the mother in money matters.

In this case involving human relations the most intimate and sacred there obviously remains much that is undisclosed, which if contained in the sworn testimony would aid materially in arriving at a decision. We cannot even avail of matter divulged in private conferences during efforts toward a compromise. Since the court can consider only the evidence in the record and reasonable inferences drawn therefrom, the most that can be hoped for is to approximate absolute justice by applying the rule of preponderance. The moving party here has so far failed in sustaining the burden of proof that her attitude in insisting on a decision involving undesirable publicity, instead of consenting to an order granting her greatly enlarged visitation rights, seems to me mysterious.

Her one-sided education and her large income with the free range it has given her over a period of years, coupled with her present predominating maternal affection, have made it difficult for her to appreciate that where the relationship of mother and child exists there exists also the relationship of father and child and that each has rights even in the face of superior financial advantage on the side of the other. Such a situation was authoritatively disposed of in the case of *Lester* v. *Lester* (178 App. Div. 205), where the court held that " the philosophy of this teaching, if carried to its logical consequence, would justify the State in taking away from parents of little means a precocious and promising child and giving it to

others who, by means of their greater wealth, could give it greater material advantages. That philosophy has never yet been accepted in this country and I think it is not likely to be."

It is a simple matter for the court to decide the custody of children between quarreling parents where the father is a worthless character or the mother a dissolute person. It is a most difficult and painful duty, however, in a case like this where no such charges are involved. In such a case the best result in my opinion is what the parties can be persuaded to agree to. Efforts were made, therefore, to bring about a consent order, and the father was willing to concede almost everything except custody of the boy during his school days. Had such consent been reached I would have recommended expunging from the record all the testimony for the sake of the boy's eventual welfare, since he is the innocent victim of their failure as parents, and should be spared, if possible, from feelings of regret to the point of resentment and humiliation when he is old enough to appreciate what it all means.

In order to determine the question of custody, it is not necessary to rely on or even consider a mass of the testimony that would have been material only in an action for separation. I suggested several times throughout the hearings that such testimony had nothing to do with the welfare of the boy, but both sides persisted.

Even if the child's welfare would be served equally well by being in the custody of either of the parents, the scale is turned to the father's side by the mother's non-compliance with former agreements, her violations of court orders and by her resorting to a Nevada divorce. The father, on the other hand, comes into court with clean hands. He has not flouted the laws of the State of their residence. He has lived up to the terms of agreements and court orders, and he has done no wrong. He has refrained from seeking an absolute divorce under the laws of this State out of consideration for the boy's welfare. (*Lester* v. *Lester*, 178 App. Div. 205.)

There is nothing helpful towards the solution of the sole problem before me at this time in those decisions relied on by the mother, either in actions or proceedings where the child involved was an infant in arms, or a girl, or a boy half the present age of Alan, or a child of either sex and of tender age requiring the nursing care of a mother. Alan is in none of these categories now. He was, however, six years ago when the mother consented to the order awarding complete custody to the father.

Respondent's brief also stresses a line of cases which pass lightly over the merits and demerits of respective parents in determining the question of custody and emphasize the need, for children of tender age, of a mother's nursing care even where the mother's

conduct was reprehensible and the father was blameless. If there had been a hearing six years ago when the order now sought to be modified was signed, the court would probably have awarded the custody of Alan to the mother, had she so requested, regardless of parental merits or demerits. But there was no hearing and the order being on consent, she waived custody in favor of the father, from which the inferences may be drawn that in her pursuit of pleasure and happiness she desired not to have her previous activities disclosed and preferred to be free from maternal responsibility. The situation has since changed. Instead of an infant six years old we have a boy twelve years old who needs now the guidance and supervision of a father as he needed then the tender care of a mother. Dread of publicity which a hearing would have entailed is the explanation now offered for her waiver of custody six years ago, but in the light of subsequent events I can only regard this explanation, however sincerely made, as in the nature of an afterthought.

With regard to the feeling of the parents, it requires no straining of the testimony to appreciate what the father has endured in the wreckage and wake of their ill-fated union. It is sufficiently indicated in the correspondence between them which is part of the record.

But the mother has suffered much, and much allowance should be made for her as a mother. She has suffered because of the handicap in her education, for which she was not to blame. She has suffered because of her unfortunate matrimonial experiences and she has suffered through her years of futile quest for happiness in different cities, states and countries. Even though much of her suffering has been the natural consequence of her own deliberate, voluntary acts, still if the decision recommended on the main question of custody be adopted it should also be tempered with the maximum of consideration to her as a mother that is consistent with the father's custody of the boy throughout his school days.

The modifications recommended will give the mother much more of her son's companionship than if her request to have him sent away to a boarding school had been granted, and will give the boy two full days with his mother, three week ends to look forward to during the schooldays instead of three hours, two Saturdays each month, and in the summer vacation two full months instead of six weeks, with other holidays equally divided.

I, therefore, recommend that the motion for modification of the order herein, dated May 10, 1929, be denied with regard to change of custody, but that it be otherwise granted, to read as follows:

" 1. The sole charge, education, care and custody of the infant son, Alan Sanford Glendening, shall be continued in his father,

the relator, Harold Sanford Glendening, until further order of this court.

" 2. The mother, Alicia Maddox Glendening, shall have the right to have Alan with her during the summer vacation, with the exception of one month thereof to be fixed at the father's option on or before June 1st of each year. The father shall have the right of visitation from Alan on every alternative weekend, during summer vacation, unless the parents agree on some other arrangement.

" 3. The parents shall divide the Christmas and Easter holidays equally between them, Christmas Day every other year.

" 4. During the school year the mother Alicia Maddox Glendening shall have the right to a visitation from her son Alan and to have him with her from 8 P. M. Friday until 8 P. M. on Sunday evening, on the second, third and fourth weekends of each month.

" 5. In case of any illness of the child Alan, or any other emergency, occurring while the child is with one parent, the other parent is to be notified at once and permitted to see him and be with him.

" 6. Neither party shall remove the said infant from the State of New York or from the jurisdiction of this court at any time without the written consent of the other, except that the father shall be permitted to take said infant to his mother's home in Norwalk, Connecticut, a distance of about 42 miles from New York City, and either the mother or the father may take the child during their share of the summer vacation to an appropriate place in a State of the United States, which is contiguous and adjacent to the State of New York. Neither party shall conceal the whereabouts of the infant from the other party at any time, but must keep the other party informed as to the whereabouts of the said child at all times.

" 7. This order shall remain in full force and effect until modified by this court."

Dated January 10, 1936.

Report of referee confirmed by Mr. Justice LLOYD CHURCH, January 27, 1936.