In the Matter of the Petition of LIBBY STARR for an Order Determining the Custody of CONSTANCE BROCK, an Infant. LOUIS BROCK, Appellant; HELEN JOSEPHSON and Others, Respondents.

Second Department, June 7, 1935.

*Louis Maier*, for the appellant.

*Eugene Untermyer* [*David H. Moses* and *Milton E. Mermelstein* with him on the brief], for the respondent Helen Josephson.

*Humphrey J. Lynch* [*Monroe J. Cahn* and *George B. Francis* with him on the brief], for the respondents Libby Starr and Samuel Starr.

CARSWELL, J. This litigation concerns the custody of ten-year-old Constance Brock. In 1928 her mother, Helen Brock, obtained a decree of divorce from Louis Brock. She was given but did not take custody of the child. The child continued as theretofore to be domiciled with her maternal grandparents, Libby and Samuel Starr.

Helen Brock then married Robert Josephson. After this event Constance still continued with her grandparents. She was taken to Europe by them in the summer of 1934. On their return the mother, now Helen Josephson, refused to allow the child to continue with the maternal grandparents.

This precipitated a proceeding by the grandparents. They petitioned, on November 14, 1934, in equity, for an order to determine the child's custody. They brought in the father, Louis Brock, and the mother, Helen Josephson. On the return day, November 16, 1934, all the parties, in open court, stipulated that

the proceeding be referred to Official Referee Morschauser " to hear and determine." Fifteen hundred pages of testimony were taken. The hearings concluded January 14, 1935. The referee wrote an opinion on January 21, 1935, stating that the child should continue with the maternal grandparents. On January 23, 1935, he signed an order in which he decreed that the custody of the child be awarded to the maternal grandparents, with the right of visitation to the mother, Helen Josephson. On the hearing the father, Louis Brock, had sought custody of the child. Having been denied custody, he acquiesced in the disposition made.

On February 19, 1935, the mother served a notice of appeal from the order. That appeal has not been perfected or argued.

On March 15, 1935, in disregard of this appeal, the mother moved at Special Term for a modification of the order or, in the alternative, a rehearing and redetermination. On March 16, 1935, she also moved before the same Special Term for an order, under section 470 of the Civil Practice Act, declaring the reference before the official referee at an end, on the theory that the opinion and order had not terminated the proceeding and he had failed to file a report. With these two motions undetermined, the father, Louis Brock, inconsistently adopted the theory of the mother, that the official referee's opinion and order were ineffective as determining the controversy. He moved to treat them as a report to the court of the referee's opinion, and he asked its confirmation. This motion was referred to the same Special Term before whom the mother, meanwhile, in disregard of all prior proceedings, had instituted habeas corpus proceedings.

The Special Term denied the motion to terminate the reference, on the theory that section 470 was inapplicable. It declared the so-called final order to be void on the theory that the statute under which the referee acted was invalid or unconstitutional, if construed to authorize an official referee to hear and determine this proceeding. It also denied the motion of Louis Brock, the father, to treat the official referee's opinion and order as a report of his opinion, the court declining so to do by confirming or rejecting it. From the order denying his motion, this appeal is prosecuted by the father.

At this stage the Special Term assumed to go ahead with the habeas corpus proceeding, but this court stayed the hearing pending the determination of this appeal.

If a reference to an official referee to hear and determine in a proceeding concerning the custody of a child is valid, we never reach the question of whether or not that which the referee did may be treated as a report of his opinion and acted upon accordingly. Nor do we reach the merits.

It is urged that the final order may not be attacked by reason of claimed unconstitutionality of the statute under which the referee assumed to act, because the question was not raised during the main proceeding. (*Matter of Kipp*, 70 App. Div. 567; *People* v. *Ostrander*, 144 id. 860; *Matter of Andersen*, 178 N. Y. 416; *People* v. *Gowasky*, 244 id. 451, 463.) But if the final order be void, it would not avail, in a habeas corpus proceeding, to justify the retention of the custody of the child. Hence the validity and scope of the statute under which the official referee acted must be determined, so that it may be decided whether or not what purports to be his final order has validity.

(1) The proceeding was initiated by petition in conformity with proper procedure. (*Finlay* v. *Finlay*, 240 N. Y. 429.) It was heard by an official referee, to whom a Special Term, under sections 115 and 116 of the Judiciary Law, referred it to hear and determine.

Before considering the statutes, we should trace the origin and ascertain the extent of the power of the Legislature over the Supreme Court and the means by which it functions, especially before its jurisdiction was first directly mentioned in a constitutional provision. (Unamended Const. 1846, art. VI, § 3; Amended Const. 1846, art. VI, § 6.)

In the Constitution of 1777, article XXXV, the common law of England and the acts of the Colonial Legislatures were declared to be the law, subject to alteration by the Legislature. The only limitation upon legislative power was in article XLI, which preserved the right of trial by jury, forbade attainder and declared that the Legislature at no time should institute any new court or courts other than those then existing, which included a Supreme Court for actions at law and the Court of Chancery for actions in equity. That Constitution did not create or continue the Supreme or Chancery Court, but treated them as existing by referring to the incumbents thereof. (*Matter of Steinway*, 159 N. Y. 250, 257.)

In the Constitution of 1821, article VII, section 2, limitation of legislative power was again declared respecting trial by jury, and it was provided that "no new court shall be instituted, but such as shall proceed according to the course of the common law; except such courts of equity as the legislature is herein authorized to establish." (*Phillips* v. *Gorham*, 17 N. Y. 270, 272.) The Supreme and Chancery Courts thus were again treated as in the prior Constitution.

In the Unamended Constitution of 1846 (Art. VI, § 3) and the Amended Constitution of 1846 (Art. VI, § 6) it was declared there should be a Supreme Court "having general jurisdiction in law and equity." By article XIV, section 8, courts of chancery were

abolished. To supersede the old Supreme Court, which was of statutory origin (1 Col. Laws, pp. 226–229, enacted May 6, 1691; *Matter of Steinway*, 159 N. Y. 250, 257), a new Supreme Court was authorized to be constituted, with law and equity jurisdiction (2 Lincoln Const. History, p. 217). The distinction between actions in law and suits in equity was abolished and a single form of civil action authorized. (*Lattin* v. *McCarty*, 41 N. Y. 107, 110.)

In the 1894 Constitution, article VI, section 1, it was provided: "The Supreme Court *is continued* with general jurisdiction in law and equity, subject to such appellate jurisdiction of the Court of Appeals as now is or may be prescribed by law not inconsistent with this article."

Thus no limitation upon legislative power appears in any Constitution which would deprive that body of the power to constitute a new medium or agency for official action within the existing Supreme Court as an aid thereto. On the contrary, constitutional recognition appears of the plenary power of the Legislature in this particular, as thus traced.

The 1846 Amended Constitution also provided (Art. VI, § 8), as did the Unamended 1846 Constitution (Art. VI, § 5), that the Legislature had power to " alter and regulate the jurisdiction and proceedings in law and equity  *  *  *  heretofore exercised." (*Wilcox* v. *Wilcox*, 14 N. Y. 575, 578.) This later appears in article VI, section 3, of the Constitution of 1894. Pursuant to amendment in 1925, it is now in article VI, section 20, in the following form: " except as herein otherwise provided, the Legislature shall have the same power to *alter and regulate* the jurisdiction and proceedings in law and in equity that it has heretofore exercised."

We may now examine the challenged exercise of that power in sections 115 and 116 of the Judiciary Law. (Former §§ 115, 116 repealed and new §§ 116, 117 added by Laws of 1935, chap. 854, in effect July 1, 1935.)

Section 115, so far as pertinent, reads: " To any such official referees may be referred any action, matter or proceeding pending in said supreme court, or in a surrogate's court, referable by statute or the rules and practice of said court, in which the justice or surrogate making the order of reference shall deem that for any reason the expense of such reference should not be borne by the parties to such action, matter or proceeding, and to any such official referee may also be referred any action, claim, or special proceeding of a civil nature, by consent of the parties thereto, and any such referee may sit and discharge his duties in any county of the state. There may also be referred to any such official referee an undefended action for divorce, or for a separation, or to annul a marriage, or

a proceeding for the dissolution of a marriage on the ground of absence."

Section 116, so far as pertinent, reads: " As to all *ex parte* motions and motions, actions, or proceedings submitted to said referee by stipulation of the parties appearing therein, or order of the court, except matrimonial actions, the same shall be deemed duly referred to said official referee and, in addition to all the powers now conferred by section four hundred and sixty-nine of the civil practice act, *he shall proceed therein with the same power and authority as a justice presiding at a regular special term of the supreme court* and entertain and grant motions for a new trial, grant stays and orders to show cause; and similar jurisdiction and authority as to any other action or proceeding referred to him by order of the supreme court including matrimonial actions."

The foregoing statutes, particularly the part italicized, authorize an official referee to do that which a justice at Special Term could do in any proceeding. There is an exception, but it does not comprehend a proceeding concerning the custody of an infant. Hence, if the statute is valid, the official referee had jurisdiction to do that which he here did. An official referee, by the provisions in the first part of section 115, is required to be one who has had judicial experience; one who has mature and seasoned judicial discretion. In this respect he differs from an ordinary referee. He is a creature of statute, who, in the actions and proceedings enumerated, may act " with the same power and authority as a justice presiding at a regular special term of the supreme court." But, under the statute, he may so act only in the event that a Supreme Court justice consents by referring a matter to him in accordance with the statute. The Special Term may withhold authorizing the use of the instrumentality or may limit the extent of the exercise of power by it. The Special Term can limit a reference to an official referee to report with his opinion, or it may make the reference one to hear and determine except as otherwise limited by the statutory exclusion of certain actions, which latter do not include the custody of an infant. The official referee does not act to the exclusion of the Supreme Court, but as a supplement to it and upon its consent. When he exercises the jurisdiction conferred by the statute, he does not do so by way of an invasion of the " general jurisdiction in law and equity " of the Supreme Court. That jurisdiction remains unimpaired by the statute. A new agency is created to supplement the machinery of the Supreme Court in the exercise of its jurisdiction. These statutes do not abridge or decrease the powers of the Supreme Court. They enlarge its capacity by enabling it to utilize, when it so desires, an experienced aide in the exercise of its functions.

These legislative enactments are valid under the provision that "the Legislature shall have the same power to alter and regulate the jurisdiction and proceedings in law and in equity that it has heretofore exercised." (Art. VI, § 20.) And the jurisdiction continued in the Supreme Court by article VI, section 1, is not, by these statutes, interfered with or diminished in the slightest degree. It is merely "regulated."

(2) Another view reinforces the same conclusion, that the Legislature had the power to enact these statutes as thus interpreted and to empower an official referee to determine *inter alia* the custody of an infant.

The Legislature possesses the power, as the successor to the Crown, to function and legislate in its capacity of *parens patriæ*.

The authorities leave in some degree of obscurity the origin of the jurisdiction of equity courts to control the custody of infants. Likewise, the devolution of that power is vague and shadowy. The weight of authority indicates that the determination of such custody did not involve a juridical question. It was not the subject-matter of a conventional action or proceeding to which there were parties; because an otherwise potential party, such as a father or mother, does not have a cause of action against the other, or against any one, respecting the custody of an infant. (*Finlay* v. *Finlay*, 240 N. Y. 429, 433.)

The determination as to who should have custody of infants was a prerogative of the Crown. The King deputized the chancellor to act for him in exercising what was essentially an administrative or executive function. The proceeding before the chancellor partook the form and nature of a judicial administration of rights and duties. He, however, acted as a mere administrative delegate of the Crown. His right to act did not arise by virtue of his office or as part of his extraordinary jurisdiction. It was derived by special authority from the King, as *parens patriæ*. For a reason not clear in the authorities, appeals from the chancellor in proceedings respecting custody of infants went to the House of Lords; while appeals from the chancellor, in the exercise of the similarly delegated power from the Crown to exercise similar administrative functions in respect of lunatics and idiots, went to the King's Council. (Bispham Equity [7th ed.], §§ 34, 542, 551, and cases cited; Story Eq. Juris. [14th ed.] § 1750, and cases cited thereunder.)

When the Revolution occurred, the powers of the Chancery Courts and the chancellor devolved upon the Chancery Courts of this State. This carried with it *inter alia* the passing upon the custody of infants, in the continued exercise of this deputized power

from the Crown. No legislation was needed to vest this power in the Chancery Courts (*Wilcox* v. *Wilcox*, 14 N. Y. 575, 578), which later devolved upon the Supreme Court. It was, however, subject to legislative power, because the prerogatives of the Crown devolved upon the State, and these prerogatives, including the power as *parens patriæ*, belonged "exclusively to the legislature of each state." (3 Pom. Eq. Juris. [4th ed.] § 1304, footnote thereto, and cases cited; *Mormon Church* v. *United States*, 136 U. S. 1, 56; 4 Kent Comm. 508, note.) When the Crown originally delegated to the chancellor part of its power over infants, it did not divest itself of all power over that subject-matter. The delegated power was exercised subject to further regulation by the Crown or Parliament, in so far as the latter body encroached upon the Crown's prerogatives. Parliament did not encroach upon the Crown's prerogatives, so far as the custody of infants was concerned and its delegation of such functions to the chancellor, from the time of James I down to the Revolution. It is this retained body of power respecting regulation, vesting in the Crown and Parliament at the time of the Revolution, which passed to the Legislature as *parens patriæ* contemporaneously with the devolution of the delegated power to the Chancery Courts that passed to the State Chancery Courts at the time of the Revolution, subject to legislative regulation and control. (Const. 1777, art. XXXV.)

Neither the State Constitution of 1846 nor the earlier Constitutions placed limitations upon the legislative exercise of the power as *parens patriæ*. (*Wilcox* v. *Wilcox*, 14 N. Y. 575, 578.) In the Unamended Constitution of 1846 (Art. VI, § 3) and the Amended Constitution of 1846 (Art. VI, § 6) it was provided that the Supreme Court was to have "general jurisdiction in law and equity." In the 1894 Constitution (Art. VI, § 1) this jurisdiction was continued. This section does not prohibit the Legislature granting general jurisdiction to another tribunal, provided it is not territorially co-extensive with the Supreme Court or does not assume to oust it of its jurisdiction (*People ex rel. Swift* v. *Luce*, 204 N. Y. 478; *Matter of Stilwell*, 139 id. 337), or does not interfere with the Legislature exercising its power as *parens patriæ* to which it had succeeded under the authorities cited.

The Legislature, as the successor to the Crown as *parens patriæ*, so far as that power was retained by the Crown at the time of the Revolution, may validly regulate the manner in which the custody of children should be determined. It may do so by authorizing a part of an existing tribunal (Supreme Court) to act upon the subject of custody of infants. It was entitled to exercise this power thus devolved upon it independently of the express authorization in

the Constitution, formerly article VI, section 5, and now article VI, section 20, that " the Legislature shall have the same power to alter and regulate the jurisdiction and proceedings in law and in equity that it has heretofore exercised." This provision, appearing in the 1846 and 1894 Constitutions, may be said to be a recognition of a previously existing power respecting equity proceedings devolving as indicated, more especially as the power thus exercised in respect of the custody of infants was not a true exercise of equity power but rather an anomalous exercise of administrative or executive power at the behest of the Crown.

Sections 115 and 116 of the Judiciary Law, as thus interpreted, are valid on either of these two theories of legislative power. Hence the order of January 23, 1935, evolving from the proceedings conducted pursuant to the order of reference of November 16, 1934, was not void by reason of any constitutional infirmity lurking in sections 115 and 116.

(3) Questions involved in the attack upon what purports to be the final order of the official referee, so far as it relates to the sufficiency of the findings upon which it is based, as well as the form of the order itself, may not be determined on this appeal. They must await the pending appeal from the final order itself. If the form of the determination is irregular, the matter may then be remitted " for formal decision as required by law " (*Smith* v. *Geiger*, 202 N. Y. 306), or this court may make disposition on the merits in a manner in conformity with law.

(4) Seemly and orderly administration of the law requires that habeas corpus proceedings, or a duplicative petition to the Supreme Court with the same objective, should not be entertained by any court with respect to the custody of the infant here concerned, in the absence of an affirmative showing that there has been a change in circumstances relating to that infant since the order of January 23, 1935, was made following an exhaustive hearing.

For these reasons, and not for those stated at Special Term, the order should be affirmed, without costs.

LAZANSKY, P. J., YOUNG, TOMPKINS and JOHNSTON, JJ., concur.

Order, so far as it denied appellant's motion to confirm the report of an official referee awarding the custody of appellant's ten-year-old daughter to her maternal grandparents, affirmed, without costs.