H. William Thompson, Doing Business under the Firm Name and Style of the Lyric Theatre, Respondent, *v.* Fred Boekhout; Lewis Townsend, Individually and as President of the Moving Picture Operators, Local No. 253, Also Known as the Rochester, New York, Moving Picture Operators, Local No. 253 of the International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators of the United States and Canada, and Alvin Moyer, Appellants.

Fourth Department, November 18, 1936.

*John J. Scully,* for the appellants.

*Nicholas J. Weldgen,* for the respondent.

Per Curiam. The order should be affirmed upon the ground that a " labor dispute " is not involved in this case within the contemplation of subdivision 10, paragraphs (a), (b) and (c), of section 876-a of the Civil Practice Act. That subdivision is clearly intended to be far reaching, although it is difficult of analysis and construction. It is evident that the Legislature went far in preventing the use of law court machinery to protect property rights from despoliation by persons claiming to have grievances against the property owners. Still, the statute must be read with the rights and claims of the public and of business men in mind, as well as the rights and claims of labor unions. Whatever may be said about the controversies going on while defendant Moyer was an employee of

plaintiff, when the enjoined acts of defendants were initiated and while they were continuing, plaintiff's situation was exactly the same as if he had never had an employee. He was, by his own choice — a choice which he was entirely free to make — conducting a business without hiring help. His business was interfered with to his serious and continuing damage simply because he did not choose to hire a projectionist at a salary named by defendant Moving Picture Operators. We do not reach the constitutional question so ably discussed by our brother EDGCOMB in the dissenting opinion, where the facts are stated. We stand entirely upon our conclusion that the Legislature cannot have intended by section 876-a of the Civil Practice Act to prevent one in the position of this plaintiff when this picketing started from invoking the equity powers of the Supreme Court without being compelled to comply with all the cumbersome and expensive preliminaries prescribed in section 876-a. And the injunction granted furnishes plaintiff his only adequate remedy.

All concur, except SEARS, P. J., and EDGCOMB, J., who dissent and vote for reversal on the law and denial of the motion in an opinion by EDGCOMB, J. Present — SEARS, P. J., TAYLOR, EDGCOMB, THOMPSON and CROSBY, JJ.

EDGCOMB, J. (dissenting). On January 2, 1936, the defendant Townsend, president of the local union, presented to the plaintiff for his signature a proposed agreement, which provided in substance that the plaintiff would employ only moving picture operators supplied by the union, and would pay each operator not less than forty-nine dollars per week. The defendant Moyer, a member of the union, was employed by the plaintiff at the time, and was receiving thirty-five dollars a week. Plaintiff's theatre was a small one, and drew its patronage from the surrounding neighborhood. The receipts were small, and plaintiff felt that he could not stand the strain of the increased wage demanded by the union. There were other objectionable features to the proposed agreement which are unnecessary to detail here. In an effort to compromise the matter, and keep in the good graces of the union, plaintiff offered a ten per cent increase, which would raise the weekly salary of his projectionist to thirty-eight dollars and fifty cents. This was not satisfactory to the union, and negotiations were continued, plaintiff insisting all the time that he was unable to meet the full demand which was made upon him. The union wanted to use the agreement as a lever to force other neighborhood theatres to make similar contracts, and accordingly offered to give the plaintiff, if he would sign the agreement as drawn, a rebate of eight dollars a week from

January 15 to October 1, 1936, and four dollars per week from October 1, 1936, to January 1, 1937. Such an underhanded and clandestine arrangement would have been unfair to the proprietors of other theatres, and plaintiff refused to become a party to the scheme. Finally the defendant Boekhout, business manager of the union, said to him, " Bill, you don't want any heat on the place; you had better sign the contract. Tuesday is the dead line." Fearing for the safety of his equipment if he permitted Moyer to remain in the projection room and operate the machine after the " dead line," plaintiff decided to take over the work himself. He was a licensed projectionist. Accordingly he discharged Moyer on January 27, 1936, since which time he has operated his own machine.

The defendants thereupon commenced to picket the theatre. Each night from five to fifteen men congregated about the entrance; two men were constantly picketing, while the others stood around molesting plaintiff's patrons, and displaying a sign to the effect that the theatre did not employ union operators. While that statement was technically correct, it told only half the story; the theatre employed no operators whatever, either union or nonunion. Patrons were accosted with the following salutations: " Don't go in there. What do you think we have got these men walking back and forth for? Don't go in there with that herd." " We will soon have this place closed." " Don't go in there, there is a strike going on." There was no strike, and the statement to that effect was untrue. As a result of this picketing, plaintiff's business has fallen off to a marked extent, and his property rights have been invaded.

Feeling himself aggrieved by the conduct of the defendants, plaintiff commenced this action in equity, and asked that an injunction be issued restraining the defendants from stationing pickets at or near the theatre, and from interfering with the conduct of his business, and from attempting to intimidate, coerce or compel the plaintiff to enter into any contract with the defendants. Pending the trial and determination of the action, plaintiff has been granted a temporary injunction enjoining the defendants from interfering with his business, and from picketing the theatre, save by one man at a time, who may walk in front of said theatre with or without placards, but who shall not address any one concerning the theatre, or anything pertaining to it. It is from this order that the defendants appeal.

Appellants insist that the court had no jurisdiction to grant the order appealed from because the requirements of section 876-a of the Civil Practice Act have not been complied with. This section,

which went into effect April 25, 1935, takes from the court all jurisdiction to issue a restraining order, either temporary or permanent, in any case involving or growing out of a labor dispute, except after a hearing, and after findings of the many facts therein stated. Without going into detail, it may be said that no attempt has been made to comply with the requirements of the section, and if it is a valid and effective statute and applies to the facts in this case, the injunction order was improvidently granted, and should be reversed.

Respondent takes the position that the act has no application here, because the case does not involve or grow out of a labor dispute.

The act is patterned after, and is couched in almost the identical language used in the Norris-LaGuardia Act.* Subdivision 10 of the section defines the term " labor dispute " as follows:

" When used in this section, and for the purpose of this section: (a) A case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, craft or occupation, or who are employees of one employer; or who are members of the same or an affiliated organization of employers or employees; whether such dispute is between one or more employers or associations of employers and one or more employees or associations of employees; between one or more employers or associations of employers and one or more employer or associations of employers; or between one or more employees or associations of employees and one or more employees or associations of employees; or when the case involves any conflicting or competing interests in a ' labor dispute ' (as hereinafter defined) of ' persons participating or interested ' therein (as hereinafter defined).

" (b) A person or association shall be held to be a person participating or interested in a labor dispute if relief is sought against him or it and if he or it is engaged in the industry, trade, craft or occupation in which such dispute occurs, or is a member, officer or agent of any association of employers or employees engaged in such industry, trade, craft or occupation.

" (c) The term ' labor dispute ' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing or seeking to arrange terms or conditions of employment, or concerning employment relations, or any other controversy arising out of the respective interests of employer and employee, regardless of whether or not the disputants stand in the

---

* See U. S. Code, tit. 29, §§ 101–115.— [REP.

relation of employer and employee." (Added by Laws of 1935, chap. 477, in effect April 25, 1935, repealing all acts in conflict therewith.)

It will be observed that this definition is ambiguous and confusing. In determining its meaning, however, we must keep in mind the evil sought to be remedied, and the end desired to be accomplished, and give to the statute such a broad and liberal construction as will, so far as possible, carry out the intention of the legislation. ( *United Electric Coal Companies* v. *Rice*, 80 F. [2d] 1, 5; *Wiley* v. *Solvay Process Co.*, 215 N. Y. 584, 588, 589; *Caddy* v. *Interborough Rapid Transit Co.*, 195 id. 415, 420.)

It is an underlying principle in the construction of all statutes that the court should follow, so far as the language of the act will permit, the purpose and plan of the Legislature. (*People ex rel. Bockes* v. *Wemple*, 115 N. Y. 302, 307, 308.)

Applying this rule, I have reached the conclusion that we are dealing here with a labor dispute as defined by the act.

It is true, as urged by the plaintiff, that there can be no dispute unless there are two or more persons to disagree with each other. One can hardly quarrel with himself. We may also concede that there can be no " labor dispute " unless the controversy grows out of labor relations. It cannot be said, however, that because the plaintiff discharged his former employee, and is now acting as his own projectionist, there is no employee here who is interested in this controversy.

The primary question which is presented here is not, as claimed by the plaintiff, whether the proprietor of a business can be compelled to hire and pay an employee to do the work which he chooses to do himself, or put up with the irritation and annoyance which result from the picketing of his place of business. We are dealing with a remedy, and not with the fundamental rights of the plaintiff. This distinction must not be lost sight of in this discussion. No one can successfully deny plaintiff the right to discharge Moyer, and to act as his own operator, unless some contract right has intervened. We have not yet reached a stage in this country where the proprietor of a business can be denied the right to do his own work, if he so desires. One is not bound to hire some person to do that which he himself is able and willing to do. If that were the law, business would be at a standstill, and labor as well as capital would be the loser, for the country would be in a chronic state of financial depression from which there would be no escape. The plaintiff has the fundamental 'right to run his own business, and earn his own livelihood as he sees fit. He may hire and discharge whomsoever he chooses, and is not obliged to state his

reason for so doing. Denying him an injunction to prevent the picketing of his theatre does not deprive him of that right; it may make it more difficult for him to resist the demands of the union, but it does not compel him to yield to their dictation; it simply divests him of the right to resort to a court of equity to put an end to that which, no doubt, has become a most vexatious and irritating attempt to drive him to terms.

Peaceful picketing is lawful in this State. While many times it becomes a source of great irritation and annoyance to the one whose place of business is selected for such attention, the legal right to resort to such tactics is well settled. If the primary purpose is to further the interests of the members of the union and improve their condition — and that is supposed to be the aim of a union — whatever injury may follow to others is merely incidental, and must be endured, just as many other perplexing annoyances in our complex modern civilization have to be tolerated. (*Exchange Bakery & Restaurant, Inc.*, v. *Rifkin*, 245 N. Y. 260, 263.) Of course, if the purpose be a malevolent one to injure the employer or his business, it becomes an unlawful enterprise, even though it is not accompanied by threats or physical violence. The rule is tersely stated by Judge TAYLOR in *Remington Rand, Inc.*, v. *Crofoot* (248 App. Div. 356, at p. 358).

It is unnecessary at this time to determine just what constitutes a labor dispute within the meaning of the anti-injunction law, or to distinguish the authorities in the various jurisdictions dealing with that subject. Each case must be decided upon its own facts.

When the negotiations between plaintiff and the union started, and for substantially a month during their pendency, Moyer was in plaintiff's employ. The controversy related to the terms and conditions of Moyer's employment. He was a member of the union, and the union was acting for and on his behalf, as well as that of its other members, who were engaged in the same industry, to wit, the theatre business. Moyer had a direct interest in the outcome of the contest: the amount of his wages was in dispute. Moyer joined with the president of the union in the demands which were made. Plaintiff agreed to and actually did increase Moyer's pay ten per cent, but refused to go all the way demanded by the union. If, when Moyer was discharged, plaintiff had filled his position with a non-union employee, I take it there could be no doubt that the quarrel would be a labor dispute within the meaning of the statute. The mere fact that plaintiff took over Moyer's work and performed it himself, instead of hiring another projectionist, does not change the nature of the controversy from

what it was at the outset. To bring the facts within the provisions of the act, it is not absolutely necessary that the disputants stand in the relation of employer and employee.

If I am right in the conclusion which I have reached, we must now turn our attention to plaintiff's claim that the statute violates both the State and Federal Constitutions by depriving the plaintiff of his property without due process of law, and that it also infringes section 1 of article VI of the State Constitution by stripping the Supreme Court of its inherent power to grant injunctive relief to protect life and property rights.

The court is always reluctant to declare an act of the Legislature unconstitutional. The presumption is in favor of its validity. (*Cort* v. *Smith*, 249 App. Div. 1, and cases there cited.) If, however, its unconstitutionality is reasonably certain, a solemn duty rests upon the court to declare it invalid as repugnant to the fundamental law of the land.

While the statute in question deprives the plaintiff of a remedy which was formerly accorded him, it does not divest him of his liberty or property without due process of law. Defendants are given no immunity for their misdeeds; they are still liable for any wrongful acts which they commit. No one has a constitutional right to an injunction, either temporary or permanent. In the absence of some statute, the granting or refusing of such relief rests in the sound discretion of the court under the circumstances and the facts of the particular case. (*Remington Rand, Inc.,* v. *Crofoot,* 248 App. Div. 356, 358; *Witbeck* v. *Niagara, Lockport & Ontario Power Co.,* 214 id. 371, 373; *Hudson River Telephone Co.* v. *Watervliet Turnpike & Railroad Co.,* 121 N. Y. 397, 401; *Castoriano* v. *Dupe,* 145 id. 250, 252; *Strasser* v. *Moonelis,* 108 id. 611.)

" There is no vested right in a mode of procedure. Each succeeding Legislature may establish a different one, providing only that in each are preserved the essential elements of protection." (*Backus* v. *Fort Street Union Depot Co.,* 169 U. S. 557, 570.)

While the plaintiff has been robbed of a remedy, he has not been stripped of his property. The due process clause of the Federal or State Constitution has not been transgressed.

The other objection raised by the plaintiff to the validity of this act cannot be disposed of so summarily.

Section 1 of article VI of the State Constitution prescribes as follows: " The Supreme Court is continued with general jurisdiction in law and equity, subject to such appellate jurisdiction of the Court of Appeals as now is or hereafter may be prescribed by law not inconsistent with this article."

Legal and equitable jurisdiction was merged in the Supreme Court by the Constitution of 1846, and that court was given general jurisdiction in the two branches. This same provision has since remained a part of the fundamental law of the State.

The primary purpose of the People, as thus expressed, was to establish a great and permanent court of broad, unlimited jurisdiction; one which should not be left to the mercy of the Legislature as to its power and jurisdiction.

It would be difficult to conceive of a broader or more comprehensive term which could have been used than the word " general; " it is not some special, limited, specific or particular jurisdiction which has thus been conferred, but one which is far-reaching, extensive, and common to all legal or equitable disputes. In speaking of what was meant by the expression " general jurisdiction," as used in the Constitution, the late General Term of the First Department, in *DeHart* v. *Hatch* (3 Hun, 375, at p. 380) uses the following language: " The terms used are so comprehensive, that they include all cases of every description in law and equity, from the most important and complicated to the most simple and insignificant, and they imperatively and positively establish the court with that extended jurisdiction."

The same court in *Youngs* v. *Carter* (10 Hun, 194, discussing the same subject, says (at p. 197): " The authority given, in terms is, ' general jurisdiction in law and equity;' and that, of necessity, includes all cases which may be properly comprehended by established and existing equitable principles."

It necessarily follows that, unless consent to abridge, alter or modify the plenary power thus given the Supreme Court can be found elsewhere in the Constitution, the statute must be held violative of the Constitution. I think that such assent is to be found in section 20 of article VI, which reads as follows: " Except as herein otherwise provided the Legislature shall have the same power to alter and regulate the jurisdiction and proceedings in law and in equity that it has heretofore exercised."

True, this provision does not give to the Legislature blanket power to make such changes in the jurisdiction or practice of the court as it sees fit. By its very terms two limitations are placed on the power of the Legislature to act: (1) Any alteration must not run counter to the mandate of the document itself; (2) no new power is given to the Legislature; it can only exercise such authority as it already had at the time of the adoption of the Constitution.

The section uses the words " alter and regulate," and not " revoke, abolish, annul or rescind." The power " to alter and regulate " implies that the old jurisdiction shall in some degree continue in an

altered or regulated form. (*People* v. *Coughtry*, 58 Hun, 245; affd., 125 N. Y. 723.) The very word " alter " carries with it the idea that there is to be no destruction of the identity of the thing changed. " Regulate " is to adjust or control.

" The general jurisdiction conferred upon the Supreme Court by the Constitution does not operate to prevent the Legislature from giving additional jurisdiction to other tribunals, or from changing the common law, or from regulating and altering the jurisdiction and proceedings in law and equity in the same manner and to the same extent as had been exercised by it before the Constitution of 1846 was adopted." (*Matter of Stilwell*, 139 N. Y. 337, 342.)

What power did the Legislature have over the procedure and jurisdiction of the Supreme Court on November 3, 1925, when article VI of the State Constitution was adopted? What power did it exercise just prior to that date?

Under our system of government, governmental powers are divided into three departments — executive, legislative and judicial. Each is an entirely separate and independent body, and each is designed to act as a check upon the other. Each has its own distinct functions to perform, and can neither encroach upon the activities of the other, nor be made subordinate to another branch, without violating a fundamental doctrine of a republican form of government.

At the outset the court had inherent power to adopt its own rules of procedure. An interesting discussion of this subject will be found in the opinion of Mr. Justice PAGE in *Hanna* v. *Mitchell* (202 App. Div. 504; affd., 235 N. Y. 534). Such authority was exercised by the courts for many years, but in 1848 the Legislature, with the tacit consent of the courts, adopted the Code of Procedure, and since that time the Legislature has, to a large extent, taken over the regulation of court procedure.

So, too, but to a much lesser degree, has the court permitted the Legislature to limit its jurisdiction, or its capacity to entertain complaints or petitions, and to grant relief, which in a general way may be termed jurisdiction. The Civil Practice Act, which became a law on May 21, 1920, more than five years before article VI of the Constitution was adopted, assumes to, and actually does, fix the jurisdiction of the Supreme Court. (§ 64.) The power of the court to act in particular instances is defined in various other parts of the act. This same attempt to fix the jurisdiction of the court is found in the Code of Civil Procedure, adopted June 2, 1876. (§ 217.) From the latter date, if not before, the Legislature has assumed to have something to say concerning the jurisdiction of the Supreme Court, notwithstanding the provision in the Constitu-

tion since 1846 giving to that court general jurisdiction in law and equity, and the courts have acquiesced, tacitly at least, in that domination.

While there can be no substantial impairment of jurisdiction, and no change which would take from the court any of its historic traditions or dignity, the Legislature is permitted to regulate the legal power of the court in minor ways, so long as the real substance of its jurisdiction is not invaded or destroyed. It was never intended that all the remedies in the precise form in which and the extent to which they existed at the date of the adoption of the Constitution must necessarily be preserved intact, irrespective of changing conditions and public needs. (*Matter of Berkovitz* v. *Arbib & Houlberg*, 230 N. Y. 261, 274, 276; *Clapp* v. *McCabe*, 84 Hun, 379; affd., 155 N. Y. 525; *Matter of Brock*, 245 App. Div. 5, 11; *Spreckels* v. *Hawaiian Commercial & Sugar Co.*, 117 Cal. 377, 381; 49 P. 353, 354.)

In *Clapp* v. *McCabe* (84 Hun, 379; affd., 155 N. Y. 525) it is said (at p. 381): " The Supreme Court, under the Constitution of the State, has general jurisdiction in law and equity, but the exercise of its power is subject to the limitations and regulations of the Code of Civil Procedure."

It cannot be said that the legislation here under review strikes at the traditional dignity or power of the court. It is, at best, a mere regulation of the jurisdiction of the court, the same as had been exercised by the Legislature for many years before the adoption of the present Judiciary Article of the Constitution. The court still has jurisdiction to grant injunctions in proper cases. Its power has not been limited in that respect, except in so far as it relates to one class of litigation, viz., labor disputes, and then only in cases where the plaintiff fails to comply with certain specified requirements. There has been no substantial invasion of the court's general jurisdiction in equity. The Legislature is in no sense prohibited from changing the extent or operation of remedies.

The cases in which the Norris-LaGuardia Act, after which the statute here under discussion was patterned, have been declared constitutional, such as *Levering & Garrigues Co.* v. *Morrin* (71 F. [2d] 284) and *United Electric Coal Companies* v. *Rice* (80 id. 1, 5; petition for writ of certiorari denied, 297 U. S. 714; 56 Sup. Ct. 590), have no bearing here, because of the distinction which exists between the equity jurisdiction of the inferior Federal courts and that of the Supreme Court of this State. The former is statutory, while the latter is constitutional. Congress has authority to regulate the power which it confers, and may, in its discretion, take away, limit or abridge that which it has previously granted.

Plaintiff having failed to bring himself within the requirements of section 876-a of the Civil Practice Act, a valid statute, the court had no authority to grant the order appealed from. It follows that the order should be reversed.

SEARS, P. J., concurs.

Order affirmed, with ten dollars costs and disbursements.