THE PEOPLE OF THE STATE OF NEW YORK ex rel. HAROLD SANFORD GLENDENING, Appellant, *v.* ALICIA MADDOX GLENDENING, Respondent.

First Department, May 3, 1940.

*Paul W. Williams*, attorney [*Fred J. Knauer* and *Loftus Becker* with him on the brief], for the appellant.

*John W. Davis* of counsel [*Bernard Hershkopf* and *Frieda B. Hennock* with him on the brief], for the respondent.

DORE, J. The issues on this appeal relate to the custody of Alan Sanford Glendening, infant son of the parties to a habeas corpus proceeding, originally instituted in May, 1929, by the father, Harold Sanford Glendening, relator herein, against the mother, Alicia Maddox Glendening. The proceedings resulted in several applications which have been considered by our courts and the facts have been set forth in prior official reports.

The parties to the proceeding were married in London, England, in 1922. One child, the son Alan, whose custody is here in issue, was born of the marriage on July 27, 1923. In 1924 the father and mother became residents of New York county and the father has at all times since remained a resident of this county. The parents

continued to reside together in New York until February 11, 1925, when the mother left the father and the infant Alan after a quarrel and refused to return; and since that time they have not lived together.

Thereafter the mother procured a Nevada divorce against the father in September, 1926, without his appearance or consent, and she has since then entered into two successive ceremonial marriages in Nevada, the first in 1933 with one Victor Llewelyn, the second in 1936 with one George Ruddle Kent. The Llewelyn marriage was annulled in 1935 by the High Court of Justice in England on the ground that at the time it was entered into respondent was the wife of appellant herein.

In 1925 the mother brought a habeas corpus proceeding in Connecticut, and in May of that year, when the child was less than two years old, an order was entered on consent giving the mother custody with provisions for visitation by the father. In May, 1929, the father instituted the present habeas corpus proceeding to procure custody of his son; and on May 10, 1929, an order was entered on the mother's consent awarding sole custody of the child to the father with certain rights of visitation to the mother. In 1935 the mother moved for a modification of that custody order and all issues were referred to an official referee who, after extensive hearings, denied the mother's application and in his report recommended that sole custody should continue in the father. That report was confirmed by Special Term on January 27, 1936, and appears in the official reports ( *People ex rel. Glendening* v. *Glendening,* 159 Misc. 215). No appeal was taken by the mother from the order entered thereon on February 25, 1936.

In September, 1938, the mother made the present motion to modify the order of February 25, 1936, so as to give her sole custody of the boy. The father, by cross-motion, requested that the mother's rights of visitation be restricted. On such motions two orders were entered referring all issues to an unofficial referee. On the father's appeal from these orders they were unanimously reversed by this court ( *People ex rel. Glendening* v. *Glendening,* 256 App. Div. 359) and the proceeding remitted to Special Term for further action in accordance with the court's opinion. This court held that the Special Term should have disposed of the motions without a reference; that the father had devoted himself to the care, education and support of the child, while the mother had flagrantly disregarded her duties and the laws of New York; that the welfare of the child would best be served by continuing custody in the father and that the prior order be modified to prevent the mother from removing the infant from the State and protect

the child from any contact with "the mother's most recent invalid marital relationship." An order was entered accordingly in March, 1939. On appeal to the Court of Appeals this court's order was reversed (*People ex rel. Glendening* v. *Glendening*, 281 N. Y. 602) on the authority of *People ex rel. Duryee* v. *Duryee* (188 id. 440) solely on a procedural ground, viz., that the orders appealed from were intermediate orders in a habeas corpus proceeding and as such not appealable. (Civ. Prac. Act, § 1274.)

The reference then proceeded and, after numerous hearings, the referee filed his report in September, 1939, granting sole custody to the mother. On December 30, 1939, Special Term entered the orders herein appealed from, denying the father's cross-motion, granting the mother's motion, awarding her sole custody of the child with rights of visitation in the father.

Appellant contends the prior adjudication of the official referee, confirmed by the order entered February 25, 1936, and never appealed from, is *res judicata* as to the marital status of the parties and all other issues raised and determined in the prior proceedings. A decree in a habeas corpus proceeding as to the custody of an infant may constitute *res judicata*. (*Matter of Lee*, 220 N. Y. 532, 538.)

Orderly administration would require on subsequent successive applications in the same habeas corpus proceeding an affirmative showing of a change in circumstances. (*Matter of Brock*, 245 App. Div. 5, 13.) Since July 1, 1930, subdivision 7 of section 1234 of the Civil Practice Act provides that the verified petition must show whether previous applications have been made, whether any appeal has been taken from any order made upon such application, "and it must also state what new facts, if any, are shown upon such subsequent application that were not previously shown." While the Supreme Court as a court of equity, irrespective of any statute, has broad inherent powers concerning the custody of children, which powers are not limited by statutes concerning habeas corpus proceedings (*Finlay* v. *Finlay*, 240 N. Y. 429, 433; *Matter of Rich* v. *Kaminsky*, 254 App. Div. 6, 9), nevertheless the statute intimates and orderly procedure would suggest that parties to the same habeas corpus proceeding may not continually relitigate *de novo* issues that were fully litigated between them in prior applications in the same proceeding in which long and exhaustive hearings were held where there has been no change in the facts and circumstances determining such issues.

The issue in the prior application, as in this, was the custody of the child. If the dispute between the parents was not determined in its relation to the disputants, that is, the rights of the parents

as between themselves (see *Finlay* v. *Finlay*, 240 N. Y. 429, 434), it was as a matter of fact litigated and considered by the court and properly so in relation to the dominant issue in the proceeding, the welfare of and concern for the child.

Argument is made regarding the mother's alleged justification for leaving the father and her child in 1925, but the record before us does not establish justification for such action. It is settled law in this State that a foreign divorce obtained by a wife is not valid if residence was established merely for the purpose of obtaining the divorce. (*Lefferts* v. *Lefferts*, 263 N. Y. 131; *Fischer* v. *Fischer*, 254 id. 463.) Justification would be material only if there was a *bona fide* change of residence on the part of the allegedly wronged spouse. The official referee found in 1936 and this record shows the mother went to Reno in 1925 solely for the purpose of obtaining a divorce. No one can find otherwise without deliberately shutting his eyes to the realities.

Nevertheless, we prefer to rest our decision on the merits of the case as revealed in the record before us rather than on any estoppel by prior adjudication. On this reference the principal witnesses were the mother, the father, the son and his governess for many years, a Baroness LeFevre, who was also housekeeper in the father's home. Character witnesses also testified on both sides and there were numerous exhibits. After a careful examination of this voluminous record we find it does not present issues or controlling facts materially different from those before this court on the prior appeal or before the official referee in the prior application, except that some evidence is more detailed and the boy's preference for the mother's custody more pronounced at an older age. There, however, as here, the mother charged the father had offered the boy limited social contacts; that the father led a gloomy and isolated life; that on a number of occasions he had referred to the mother in the boy's presence in scurrilous terms; that the boy was strongly desirous of being placed in his mother's custody, and that the father was not the proper person to have custody. The mother's marital record was set forth and the father's faithful care and exceptionally successful training of the boy were shown. This court, the official referee and the prior Special Term in the earlier application based their rulings substantially on the public policy of this State as declared in its statutory law and interpreted by our highest courts and on the comparative record of the two parents since 1925, seeking solely the supreme consideration in all custody proceedings " what is for the best interests of the child, and what will best promote its welfare and happiness." (Dom. Rel. Law, § 70.) After a careful scrutiny of all the evidence and the briefs

we reach the conclusion that the findings of the referee were wholly unjustified and not supported by the facts in the record, the settled public policy of the State or relevant judicial decisions of our appellate courts, and that the orders of the Special Term, while properly refraining from approving the referee's report, were clearly erroneous in approving his recommendation for a change in custody, and should be reversed.

We think the entire record compels that conclusion. This father has had the custody of his son for nearly eleven years from the time Alan was less than six until now when he is over sixteen years old. The record establishes that the father is an upright, honorable, highly intelligent, exceptionally well-educated man of culture and refinement, faithful to his parental duties and possessing sound judgment in the type of care and training most conducive to the boy's true welfare. The father is a member of the bar in this State in good standing. He is by no means wealthy, depending for his livelihood on his practice, but his income has always been sufficient to maintain a fit and suitable home for the boy and himself and provide the boy with every necessary, reasonable and desirable opportunity for education and proper training, intellectual and otherwise. The outstanding success of the father's care during the crucial years of the boy's life in which he had his sole custody is so clearly established that it cannot be successfully questioned. The boy has splendidly developed while in his father's care. He is now a healthy, strong and athletic youth of sixteen and a half years of age. In scholarship he is the leader of his class in a well-recognized school, receiving the approbation of his teachers and masters, who testified that such standing is normally not achieved if the pupil lives in an essentially unhappy home environment. As the boy's own testimony and the testimony of his teachers and others indicate, he is socially and otherwise well adjusted. The record shows the father's deep and genuine love for his son and his tireless devotion to the boy's enduring happiness. While Alan testified repeatedly that he loved his mother, that he did not love his father, that he wished and most emphatically preferred to be in his mother's custody rather than that of his father, he also testified that the father gave him all that a father should give and that he is grateful to him. His attitude toward the father plainly indicates he has a deep and wholesome respect and regard for him.

The father, too, has been most generous in the amounts he has allotted for the boy's care and education, spending, it is estimated, sixteen per cent of his entire income on the boy. The attack made on this father to show he is not a fit and proper person to have the custody of his son finds no rational basis in the record before us.

With regard to the mother, we should prefer to refrain from characterization and let the facts speak for themselves. She left her son when he was less than two years old. If at the time she had any valid ground for leaving the father (and none is established here), she could have procured a separation and the custody of her child, who at that time most needed a mother's constant presence and loving care. On the contrary, she attempted to procure from the father a prearranged Nevada divorce. In August, 1925, the mother left New York with the child and went to Reno, Nev., solely to procure such divorce. The official referee found she had attempted to get the father's appearance in that proceeding by offering him $75,000, but that he refused. Concededly the father did not appear personally or by counsel in the Nevada proceedings and was never served with process in Nevada. Nevertheless, a Nevada divorce decree was entered on September 11, 1926.

In 1928 the parents made a written agreement that the boy was not to be taken out of the Lincoln School, which he still attends, or any great distance from New York, without the consent of the parties. Nevertheless, in January, 1929, the mother took the infant secretly to Panama. In April, 1929, the mother left Panama to come to New York, leaving the child behind with residents of that country.

When her son was less than six years of age and the need for the mother's constant presence and care was still paramount in the child's life, she voluntarily consented to give him up in 1929. Although modification of the terms of custody was expressly provided for in that consent order, she made no application whatever for any change in custody for the six years between 1929 and 1935, from the time the child was six until he was twelve years old. The official referee, in the prior proceeding, found that the mother had violated the terms of the order instead of moving to modify it and had separated herself physically and spiritually from her child for long periods of time, not seeing him from April, 1933, until May, 1934, and only twice for a few hours from April, 1933, to November, 1934.

In April, 1933, the mother went to England, where she met one Victor Llewelyn, with whom she returned to this country in June, 1933. She proceeded to Nevada, where a ceremonial marriage between her and Llewelyn was performed. In July, 1933, she went abroad to England with Llewelyn, arranging for the leasing of a house in London for a term of years and taking her possessions with her apparently with the idea of making in England a permanent home. There she lived with Llewelyn until 1934, when she left Llewelyn and again returned to this country.

In the fall of 1934 Llewelyn instituted in the High Court of Justice the annulment action against her. Testifying in the reference now before the court the mother admitted she had signed papers consenting to that annulment proceeding. The decree *nisi* in that proceeding, entered by the High Court of Justice in December, 1935, recited that the ground of the annulment was that her marriage to Llewelyn was absolutely null and void because at the date of such ceremony of marriage " there was a valid and subsisting marriage between [her] and Harold Sanford Glendening," who is still alive. The decree provided that unless sufficient cause was shown why it should not be made absolute a final decree would be entered. Respondent herein did not submit any reason why the annulment should not be granted on the ground stated, and a final decree was, accordingly, entered reciting that the Llewelyn marriage was absolutely null and void as there was a valid and subsisting marriage between " respondent and Harold Sanford Glendening." The evidence in this record shows more clearly than in the prior records her guilty knowledge of this arrangement. Yet neither the referee in his long report nor the Special Term in its opinion made any mention of the admitted basis of that annulment proceeding and the mother's testimony indicating her consent to the grounds on which it was procured.

On August 8, 1936, the mother again went to the State of Nevada, a few months after the entry of the decree absolutely annulling her marriage with Llewelyn on the ground consented to by her that she was still the lawful wife of Glendening, entered into another ceremony of marriage with one George Ruddle Kent, and immediately thereafter returned to New York where she has lived with Kent as his wife.

In 1935 the mother moved for a modification of the custody order and the issues were referred to an official referee who, after taking considerable testimony, rendered his report, herein above referred to, denying the mother's application for change of custody and directing that sole custody be continued in the father until the further order of the court. He found that the mother had resorted to an invalid Nevada divorce, while the father had lived up to the terms of the agreements and the order of the court, had provided the boy, from June 1, 1929, with a good and suitable home, proper care, education and parental attention; that the boy's official school records indicated that he lost most of his school work while with his mother but made exceptional progress while with his father, and he properly concluded that for the boy's welfare he needed the discipline and guidance of his father's supervision during his school years.

This record reinforces that conclusion. The father holds degrees from Dartmouth, Columbia, New York University and Oxford University in England, which he attended as a Rhodes scholar. Apparently the mother's education consists entirely of private instruction by tutors. During the whole of the time the boy was in the father's custody the mother enjoyed an income ranging between $60,000 to $70,000 a year, but the father met the boy's heavy medical and educational expenses from his own comparatively meagre funds.

When the comparative record of these two parents is examined and weighed it is difficult to understand how any court could find that the boy's true welfare and best interests require that he be now taken from the father who for nearly eleven years has so faithfully and successfully fulfilled his obligations and given to the mother whose record during these same years we allow to speak for itself.

The referee and the court predicated their decision practically entirely on the boy's expressed preference for and love of his mother. The court held that when a boy has reached the age of sixteen and the natural claims of the father and mother are equal the wishes of the child must be given weight and, indeed, should be controlling. One fallacy in that reasoning is the erroneous major premise, destroyed by the facts in the record, that the claims of the father and mother are " equal." No reported case in the courts of this State has been called to our attention where the custody of a child has been taken from a parent who has given him for so many years the care and splendid training this father has, in order to turn him over to the other parent in circumstances similar to those disclosed herein merely because the child desires it. We are firmly convinced that the boy's welfare, his real and enduring happiness and his true and best interests will be served by continuing custody in the father who has proved himself faithful and exceptionally qualified, especially now when the boy is of an age that requires more than ever before the strong, loving paternal influence and guidance the father has demonstrated he can give. To rule otherwise is to disregard the established facts, practically to abandon the jurisdiction of the court and make a boy of sixteen the sole judge of his own moral, intellectual, physical and spiritual welfare.

Involving as they do the welfare of children and the intimate and sacred relations of the home and the family, the unit on which society and the State itself ultimately depend, it is hard to conceive of matters of greater importance that can come before the court at Special Term than the custody of infant children. Such cases transcend in relative importance any that involve mere monetary liability. In custody cases the court " acts as *parens patriæ* to

do what is best for the interest of the child. He is to put himself in the position of a ' wise, affectionate and careful parent ' [*Queen* v. *Gyngall*, 1893, 2 Q. B. Div. 232, 241], and make provision for the child accordingly." (*Finlay* v. *Finlay, supra*, at p. 433.) Yet this case was referred, not to an official referee, who is required to be one who has had wide judicial experience and a mature and seasoned judicial discretion, but to an unofficial referee and solely at the option of one of the parties to the litigation. Irrespective of whether the court should have retained the proceeding instead of referring it to any one, we think the particular practice here adopted was improper. The Special Term, on November 25, 1938, in a memorandum, stated that it was not expedient for the court to hear the evidence that would inevitably be voluminous; that the mother was a person of large means in her own right and had signified her willingness to bear the cost of the reference regardless of the outcome. The court made a conditional order giving the mother, the wealthy respondent herein, the privilege of choosing her forum, namely, a named unofficial referee, if she filed a written consent to bear the expense of the reference, waiving the statutory fees, and in default of that a supplementary order would be entered appointing an official referee. The relator had no similar choice and did not consent to such procedure, but appealed. This is not a case in which both sides consent to a non-official referee and both sides stipulate in advance that one side is to bear the expenses of such reference. This case was referred on the express condition that if the wealthy party to the litigation agreed to pay the expenses of the reference a designated referee would be appointed. Pursuant to the terms of the prior orders, the Special Term, by separate order filed December 30, 1939, directed respondent to pay the referee the sum of $6,000 for his services.

The above-entitled practice is not to be favored. It is, however, wholly unnecessary to retry the issues as the controlling facts are established beyond doubt. This litigation has been sufficiently prolonged and should be brought to a close.

The final order of custody appealed from should be reversed, respondent's motion in all respects denied, and relator's cross-motion granted, with costs and disbursements to the appellant, to the extent that the sole charge, education, care and custody of the son be restored to the father until further order of this court, and that the other terms of custody contained in the order of February 25, 1936, be reinstated except that provision 6 therein be modified to read as follows: That the mother shall not at any time remove the said infant from the State of New York or from the jurisdiction of this court without the written consent of the father.

Neither party shall conceal the whereabouts of the infant from the other party at any time, but must keep the other party informed as to the whereabouts of said child at all times.

MARTIN, P. J., and TOWNLEY, J., concur; COHN, J., concurs in the result; CALLAHAN, J., dissents and votes for modification.

CALLAHAN, J. (dissenting). This case illustrates the unfortunate situations that frequently develop when parents of children are divorced. It also demonstrates the incongruity of having different divorce laws in the various States of the United States, with the opportunity for citizens of one State to resort to another to secure divorces which may be recognized in one State and not in others. But these are existing conditions, perhaps brought about by defects in the law, which we must deal with in order to solve the troublesome questions of custody.

We must be alert, in face of the resentment which naturally arises against such conditions, to avoid decisions imposing harsh restrictions on the innocent victims of the divorce.

Relator and respondent were married when respondent was eighteen years of age. After living together for several years a separation ensued, brought about, respondent claims, by relator's cruelty. Thereafter respondent resorted to the State of Nevada and secured a divorce without obtaining personal service on appellant. Later she remarried in Nevada and resided in England with her second husband. After a lapse of several years her second husband obtained an annulment of the second marriage on the ground that the Nevada decree of divorce from appellant was invalid.

Respondent came back to the United States and has since married a third time, again in Nevada.

Fifteen years have elapsed since the separation of these parties. In this period custody of the child of the marriage was divided between the parents, but was largely with appellant, the father. On several occasions the parties resorted to the courts for directions concerning the child's custody. In disposing of these applications the courts of this State saw fit at times to criticize the conduct of the mother resorting to another State for divorce. The boy has grown to be almost seventeen years of age. He is well through his high school course. He has been thoroughly informed of the marital experiences of his mother. In fact, the father has taken pains to call to his attention criticism of his mother contained in decisions of the courts. Nevertheless, the boy has seen fit repeatedly and unalterably, in and out of court, to evidence his desire to live with his mother.

In a very short time the boy will be able to make a choice over which the courts shall have no control. Under such circumstances, especially where he has shown himself to be intelligent and well behaved, I think the boy's desire should be granted, unless it appears that it is necessary to deny it in order to promote his welfare. I see no such necessity in this case.

We cannot reasonably say that merely because a wife and mother has secured a divorce without personal service of process on the husband, but on grounds that other States have seen fit to recognize as sufficient, that to grant her custody of her child would injure the child's welfare. To do so would be wholly unwarranted. The merits of the controversy between appellant and respondent might depend largely on the question of the extent of the alleged cruelty of the appellant which caused the first separation. This is beyond disposition on the merits at this time. In this case there is no substantial ground for criticism of the mother's conduct other than her alleged disregard of the laws of this State. She asserts she had the right to take up a marital domicile in Nevada, and that the courts of that State thereby acquired jurisdiction over appellant. Assuming she is in error with respect to this, and that her present position is inconsistent with that previously taken by her, what she did from time to time was the result of advice of eminent counsel.

The records present no proof that respondent is other than a cultured lady of good character and entirely worthy of the trust which custody of her child would impose on her. True, the father is likewise a gentleman of good character and high educational attainments who has given constant attention to the well being of his son. But the circumstances require a choice between two parents who are separated. The father has had far more opportunity to win the boy's affection than has had the mother. Yet he has not been able to prevent his boy from preferring to be with his mother. This is not difficult to understand under the present circumstances, for it is quite apparent that the father is possessed of extreme bitterness over his marital experience, which he, unfortunately, has not hesitated to display in the presence of his son. This, no doubt, is what has caused the son to rally to the support of his mother and has resulted in the preference which the boy now shows. We have no proof that any undue influence enters into the boy's choice. He is of sufficient maturity to warrant our respecting his choice.

While I agree with the view of the majority that the form of the order which was made herein, permitting a reference in the event one of the parties secured the expense thereof, is to be criti-

cized, we cannot say that in this case it has resulted in an injustice, for the decision arrived at is justified, in the main, by the proof.

It is my view that we can best dispose of this case by having the struggle over this boy's custody ended now by permitting him to live with his mother, with the requirement that he make regular visits to his father. Both parents should co-operate in ending all controversy over the son, for this constant struggle will injure him if permitted to continue. Although the boy has chosen to live with his mother, there should be provision in the order that the father direct his son's education, for he has done so to date with success. The mother should be permitted to control in other respects. The question of maintenance is not of importance because of the independent means of the mother, but it seems to me that the father should pay for the boy's education and the mother for the remaining expenses.

With these modifications, I vote that the order be affirmed.

Order reversed, respondent's motion in all respects denied, and relator's cross-motion granted to the extent stated in the opinion, with costs and disbursements to the appellant; and the other terms of custody contained in the order of February 25, 1936, reinstated, except that provision 6 therein is modified as stated in the opinion. Settle order on notice.